Vacated by Supreme Court, June 28, 2004

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

YASER ESAM HAMDI; ESAM FOUAD
HAMDI, as next friend of Yaser
Esam Hamdi,
            *Petitioners-Appellees,*

v.

DONALD RUMSFELD; W. R. PAULETTE,
Commander,
            *Respondents-Appellants.*

RUTH WEDGWOOD, Professor of Law,
Yale University Law School, and
Edward B. Burling Professor of
International Law and Diplomacy,
Johns Hopkins University; SAMUEL
ESTREICHER, Professor of Law, New
York University School of Law;
RONALD ROTUNDA, George Mason
University Foundation Professor of
Law, George Mason University
School of Law; DOUGLAS W. KMIEC,
Dean & St. Thomas More Professor
of Law, Catholic University; DAVID
B. RIVKIN, JR.; LEE A. CASEY; DARIN
R. BARTRAM;
            *Amici Curiae in support of
                        Appellants.*

CENTER FOR CONSTITUTIONAL RIGHTS;
RICHARD L. ABEL, Connell Professor
of Law, University of California at
Los Angeles; WILLIAM J. ACEVES,

No. 02-7338

Professor of Law, California Western School of Law; Bruce A. Ackerman, Sterling Professor of Law & Political Science, Yale University; Lee A. Albert, Professor of Law, University at Buffalo Law School, The State University of New York; Barbara Bader Aldave, Loran L. Stewart Professor of Corporate Law, University of Oregon School of Law; Alicia Alvarez, Clinical Associate Professor of Law, DePaul University School of Law; Diane Marie Amann, Professor of Law, University of California, Davis, School of Law; Michelle J. Anderson, Associate Professor of Law, Villanova University School of Law; Fran Ansley, Professor of Law, University of Tennessee College of Law; Elvia R. Arriola, Associate Professor of Law, Northern Illinois University College of Law; Frank Askin, Professor of Law and Robert Knowlton Scholar, Rutgers School of Law at Newark; Milner S. Ball, Caldwell Professor of Constitutional Law, University of Georgia School of Law; Jon Bauer, Clinical Professor of Law and Director, Asylum & Human Rights Clinic University of Connecticut School of Law; Paul Schiff Berman, Associate Professor,

University of Connecticut School of Law; CYNTHIA BOWMAN, Professor of Law, Northwestern University School of Law; MARK S. BRODIN, Professor of Law, Boston College Law School; BARTRAM S. BROWN, Professor of Law, Chicago-Kent College of Law, Illinois Institute of Technology; SUE BRYANT, Director of Clinical Education and Associate Professor of Law, CUNY School of Law; BURTON CAINE, Professor of Law, Temple University School of Law; EMILY CALHOUN, Professor of Law, University of Colorado School of Law; ANUPAM CHANDER, Acting Professor of Law, University of California, Davis, School of Law; ERWIN CHEMERINSKY, Sydney M. Irmas Professor of Public Interest Law, Legal Ethics and Political Science, University of Southern California Law School; PAUL G. CHEVIGNY, Joel S. and Anne B. Ehrenkranz Professor of Law, New York University Law School; PAUL CHILL, Clinical Professor of Law, University of Connecticut School of Law; GABRIEL J. CHIN, Rufus King Professor of Law, University of Cincinnati College of Law; CAROL CHOMSKY, Associate Professor of Law, University of Minnesota Law School; MARGARET CHON, Associate

Professor of Law, Seattle University School of Law; MARJORIE COHN, Associate Professor of Law, Thomas Jefferson School of Law, San Diego; ROBIN MORRIS COLLIN, Professor of Law, University of Oregon School of Law; DENNIS E. CURTIS, Clinical Professor of Law, Yale Law School; ERIN DALY, Associate Professor of Law, Widener University; MICHAEL H. DAVIS, Professor of Law, Cleveland State University; MICHAEL DEUTSCH, Adjunct Professor of Law, Northwestern University School of Law; LAURA DICKINSON, Associate Professor, University of Connecticut School of Law; ROBERT DINERSTEIN, Associate Dean and Professor of Law, American University, Washington College of Law; JANE DOLKART, Associate Professor of Law, Dedman School of Law, Southern Methodist University; SHARON DOLOVICH, Acting Professor of Law, University of California at Los Angeles; DOUGLAS L. DONOHO, Professor of Law, Nova Southeastern University, Shepard Broad Law Center; DOLORES DONOVAN, Professor of Law, University of San Francisco School of Law; MARY L. DUDZIAK, Judge Edward J. and Ruey L. Guirado

Professor of Law and History, University of Southern California Law School; Visiting Research Scholar, Woodrow Wilson School of Public and International Affairs, Princeton University; PAMELA EDWARDS, Assistant Professor of Law, CUNY School of Law; NANCY EHRENREICH, Associate Professor of Law, University of Denver College of Law; ROSA EHRENREICH BROOKS, Associate Professor of Law, University of Virginia School of Law; J. SOFFIYAH ELIJAH, Clinical Instructor, Criminal Justice Institute, Harvard Law School; SUSAN J. FEATHERS, Esq., Director, Public Service Program, University of Pennsylvania Law School; MARVIN FEIN, Associate Professor, University of Pittsburgh School of Law; TODD D. FERNOW, Professor of Law, Director, Criminal Clinic, University of Connecticut School of Law; SALLY FRANK, Professor of Law, Drake University School of Law; KATHERINE FRANKE, Professor of Law, Columbia University; ERIC M. FREEDMAN, Professor of Law, Hofstra University School of Law; NIELS W. FRENZEN, Clinical Assistant Professor of Law, University of Southern California; CRAIG B. FUTTERMAN, Assistant Clinical Professor of Law,

University of Chicago Law School; KRISTIN BOOTH GLEN, Dean and Professor of Law, CUNY School of Law; BRIAN GLICK, Associate Clinical Professor of Law, Fordham Law School; HOWARD A. GLICKSTEIN, Dean and Professor of Law, Touro Law School; PHYLLIS GOLDFARB, Professor of Law, Boston College Law School; BOB GOLTEN, Director, International Human Rights Advocacy Center, University of Denver; CARLOS E. GONZALEZ, Associate Professor of Law, Rutgers School of Law - Newark; Visiting Associate Professor of Law, Santa Clara University School of Law; KENNETH W. GRAHAM, JR., Professor of Law, University of California at Los Angeles; ARIELA GROSS, Professor of Law & History, The Law School, University of Southern California; LOUISE HALPER, Professor of Law, Washington & Lee University School of Law; JOEL F. HANDLER, Richard C. Maxwell Professor of Law and Professor of Policy Studies, School of Public Policy and Social Research, University of California at Los Angeles; SIDNEY L. HARRING, Professor of Law, CUNY Law School; VIRGINIA HENCH, Associate Professor of

Criminal Law & Procedure & Civil Rights, University of Hawaii - Manoa; KATHY HESSLER, Professor, Case Western Reserve University School of Law; JUDITH L. HOLMES, Assistant Professor of Legal Studies, University of Massachusetts - Amherst; WYTHE W. HOLT, JR., University Research Professor of Law, University of Alabama School of Law; JOAN HOWARTH, Professor of Law, University of Nevada, Las Vegas; MARSHA HUIE, Professor of Law, The University of Tulsa College of Law; ERIC S. JANUS, Professor of Law, William Mitchell College of Law; PAULA C. JOHNSON, Associate Professor of Law, Syracuse University College of Law; JOSE R. JUAREZ, JR., Professor of Law, St. Mary's University School of Law; DAVID KAIRYS, James E. Beasley Professor of Law, Beasley School of Law, Temple University; YALE KAMISAR, Clarence Darrow Distinguished University Professor of Law, University of Michigan; JERRY KANG, Professor of Law, University of California at

Los Angeles; LEWIS R. KATZ, John C. Hutchins Professor of Law, Case Western Reserve University Law School; EILEEN KAUFMAN, Professor of Law, Touro Law School; MICHAEL J. KELLY, Assistant Professor, Creighton University School of Law; RANETA LAWSON MACK, Professor of Law, Creighton University School of Law; DAVID P. LEONARD, Professor of Law and William M. Rains Fellow, Loyola Law School, Los Angeles; JOHN LEUBSDORF, Professor of Law, Rutgers Law School-Newark; MARTIN L. LEVY, Professor, Thurgood Marshall School of Law, Texas Southern University; JULES LOBEL, Professor of Law, University of Pittsburgh Law School; DAVID LUBAN, Frederick Haas Professor of Law and Philosophy, Georgetown University Law Center; BETH LYON, Assistant Professor of Law, Villanova University School of Law; HOLLY MAGUIGAN, Professor of Clinical Law, New York University School of Law; SAMUEL A. MARCOSSON, Associate Professor, Louis D. Brandeis School of Law, University of Louisville; GARY M. MAVEAL, Associate Professor

of Law, University of Detroit Mercy School of Law; ROBERT F. MEAGHER, Emeritus Professor, Fletcher School of Law and Diplomacy, Tufts University; CARLIN MEYER, Professor of Law, New York Law School; JONATHAN M. MILLER, Professor of Law, Southwestern University School of Law; MARGARET E. MONTOYA, Professor of Law, University of New Mexico School of Law; BEVERLY MORAN, Professor of Law, Professor of Sociology, Vanderbilt University School of Law; DAVID A. MORAN, Assistant Professor of Law, Wayne State University Law School; MARY-BETH MOYLAN, Instructor of Law, University of the Pacific, McGeorge School of Law; MILLARD A. MURPHY, Esq., Clinical Instructor, Prison Law Clinic, University of California, Davis, School of Law; KENNETH B. NUNN, Professor of Law, Fredric G. Levin College of Law, University of Florida; JAMES P. OGILVY, Associate Professor of Law, Columbus School of Law, The Catholic University of America; NANCY K. OTA, Professor of Law, Albany Law School; MARC R. POIRIER, Professor of Law, Seton Hall Law School; JAMES POPE, Professor of Law and

Sidney Reitman Scholar, Rutgers University School of Law; DEBORAH W. POST, Professor of Law, Touro Law School; WILLIAM QUIGLEY, Professor of Law and Director of the Loyola Law Clinic & the Gillis Long Poverty Law Center, Loyola Law School; MARGARET JANE RADIN, Wm. Benjamin Scott and Luna M. Scott Professor of Law, Stanford Law School; MARTHA RAYNER, Associate Clinical Professor of Law, Fordham University School of Law; JUDITH RESNICK, Arthur Liman Professor of Law, Yale Law School; PAULA R. RHODES, Associate Professor of Law, Director, LLM in American and Comparative Law Program, University of Denver College of Law; HENRY J. RICHARDSON, III, Peter J. Liacouras Professor of Law, Temple Law School; ANNELISE RILES, Professor of Law and Professor of Anthropology, Cornell University; TONI ROBINSON, Professor of Law, Quinnipiac School of Law; FLORENCE WAGMAN ROISMAN, Professor of Law and Paul Beam Fellow, Indiana University School of Law-Indianapolis; KERMIT ROOSEVELT, Assistant Professor, University of Pennsylvania Law School; TANINA ROSTAIN,

Associate Professor, New York Law School; JED RUBENFELD, Robert R. Slaughter Professor of Law, Yale University; DAVID RUDOVSKY, Senior Fellow, University of Pennsylvania Law School; LEILA NADYA SADAT, Professor of Law, Washington University in St. Louis; NATSU TAYLOR SAITO, Professor of Law, Georgia State University College of Law; ROBERT F. SEIBEL, Professor of Law, CUNY Law School; FRANKLIN SIEGEL, City University of New York School of Law; ROBERT A. SEDLER, Distinguished Professor of Law and Gibbs Chair in Civil Rights and Civil Liberties, Wayne State University; MARCI SEVILLE, Associate Professor of Law and Director, Women's Employment Rights Clinic, Golden Gate University School of Law; MARJORIE SILVER, Professor, Touro Law Center; EILEEN SILVERSTEIN, Zephaniah Swift Professor of Law, University of Connecticut; DAVID SLOSS, Assistant Professor of Law, Saint Louis University School of Law; RONALD C. SLYE, Associate Professor, Seattle University School of Law; LLOYD B. SNYDER, Professor of Law, Cleveland State University; ANDREJ THOMAS STARKIS, Assistant Professor of Law,

Massachusetts School of Law; NORMAN STEIN, Douglas Arant Professor of Law, University of Alabama School of Law; JOAN STEINMAN, Distinguished Professor of Law, Chicago-Kent College of Law; ROBERT N. STRASSFELD, Professor of Law, Case Western Reserve University School of Law; ROBERT L. TSAI, Assistant Professor of Law, University of Oregon School of Law; BETH VAN SCHAACK, Assistant Professor, Santa Clara University School of Law; DEBORAH M. WEISSMAN, Associate Professor of Law and Director of Clinical Programs, University of North Carolina School of Law; CHARLES E. WILSON, Associate Professor of Law, The Ohio State University College of Law; RICHARD J. WILSON, Professor, Washington College of Law, American University; ADAM WINKLER, Acting Professor of Law, University of California at Los Angeles; STEPHEN WIZNER, William O. Douglas Clinical Professor of Law and Supervising Attorney, Yale Law School; MARK E. WOJCIK, Associate Professor of Law, The John Marshall Law School, Chicago; FRANK H. WU,

Professor of Law, Howard University; CLIFF ZIMMERMAN, Clinical Associate Professor of Law, Northwestern University; NATIONAL LAWYERS' GUILD, Heidi Boghosian, Executive Director; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, Dan Kesselbrenner, Executive Director; NATIONAL LAWYERS GUILD NEW YORK CHAPTER, Dana Biberman, President; HUMAN RIGHTS WATCH, James Ross, Senior Legal Counsel; SOUTHERN POVERTY LAW CENTER, Rhonda Brownstein, Legal Director; UNITARIAN UNIVERSALIST SERVICE COMMITTEE, Denise Moorehead, Deputy Director of Program; PUERTO RICO LEGAL DEFENSE AND EDUCATION FUND, INCORPORATED, Foster Maer, Acting Legal Director; NATIONAL COALITION TO PROTECT POLITICAL FREEDOM, Kit Gage, President; FIRST AMENDMENT FOUNDATION, Kit Gage, Director; NATIONAL LAWYER'S GUILD/MAURICE & JANE SUGAR LAW CENTER FOR ECONOMIC & SOCIAL JUSTICE, Julie Hurwitz, Executive Director; CIVIL LIBERTIES MONITORING PROJECT, Jared Rossman, President; ASSOCIATION OF LEGAL AID ATTORNEYS, U.A.W.

LOCAL 2325, Michael Letwin, Esq., President; PARTNERSHIP FOR CIVIL JUSTICE, Mara Verheyden-Hilliard, co-founder; TRIAL LAWYERS FOR PUBLIC JUSTICE, Rebecca Epstein, Staff Attorney; FREEDOM SOCIALIST PARTY, Val Carlson; JEWISH ALLIANCE FOR LAW AND SOCIAL ACTION, Andrew M. Fischer; THE INNOCENCE PROJECT AT THE BENJAMIN N. CARDOZO SCHOOL OF LAW, Nina Morrison, Esq., Executive Director; ELLA BAKER CENTER FOR HUMAN RIGHTS, Van Jones, National Executive Director; AMERICAN FRIENDS SERVICE COMMITTEE, Mary Ellen McNish, General Secretary; REBER BOULT, Esq., Albuquerque, New Mexico; HUNTER GRAY; JOHN MAGE, Esq., New York, New York; DOUGLAS N. MASTERS, Esq., Chicago, Illinois; LAURA BETH NIELSEN, Research Fellow, American Bar Foundation; LEONARD WEINGLASS, Esq., New York, New York; CAMILLE WHITWORTH, Esq., Austin, Texas; MITCHELL ZIMMERMAN, Esq., Co-Coordinator, Law Professors for the Rule

of Law; NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION; ACLU FOUNDATION OF
VIRGINIA,

*Amici Curiae in support
of Appellees.*

Filed: July 9, 2003

## ORDER

Appellees filed a petition for rehearing and suggestion for rehearing en banc.

The panel voted to deny panel rehearing.

A member of the Court requested a poll on the petition for rehearing en banc, and a majority of the judges in active service voted to deny rehearing en banc. Judges Luttig, Motz, King, and Gregory voted to grant rehearing en banc. Chief Judge Wilkins, and Judges Widener, Wilkinson, Niemeyer, Williams, Michael, Traxler, and Shedd voted to deny rehearing en banc.

Judge Wilkinson filed an opinion, concurring in the denial of rehearing en banc. Judge Traxler filed an opinion, concurring in the denial of rehearing en banc. Judge Luttig filed an opinion, dissenting from the denial of rehearing en banc. Judge Motz filed an opinion, dissenting from the denial of rehearing en banc.

The Court denies the petition for rehearing and suggestion for rehearing en banc. The mandate shall issue forthwith.

Entered at the direction of Judge Wilkinson for the Court.

WILKINSON, Circuit Judge, concurring in the denial of rehearing en banc:

I concur in the denial of the rehearing en banc. The panel opinion written by Chief Judge Wilkins, Judge Traxler, and myself has already properly resolved this case. *See Hamdi v. Rumsfeld*, 316 F.3d 450 (4th Cir. 2003). I thus offer only these few comments in response to the dissent of my good colleague Judge Motz.

Hamdi is being held according to the time-honored laws and customs of war. There is nothing illegal about that. The option to detain those captured in a zone of armed combat for the duration of hostilities belongs indisputably to the Commander in Chief. Art. II, Sec. II. And the question is essentially whether the United States can capture and detain prisoners of war without subjecting the factual circumstances surrounding foreign battlefield seizures to extensive in-court review.[1] The answer to this is now — and always has been — yes. In giving prisoners of war the right to litigate their detentions in American courts, the dissent would install a more restrictive regime on the executive branch after September 11 than existed before. I regret that my colleague does not even quote the provisions of Article I and Article II which delegate the conduct of war to the coordinate

---

[1]The government does not concede that Hamdi is a prisoner of war, but rather asserts that he is an unlawful combatant. For the purposes of this case, the distinction is irrelevant because the decision to detain until the cessation of hostilities belongs to the executive in either case. *See Hamdi*, 316 F.3d at 469.

The panel earlier expressed doubt that the timing of a cessation of hostilities was even justiciable. *Hamdi v. Rumsfeld*, 316 F.3d at 476 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 169 (1948) ("Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled.")). It would be an intrusive venture into international relations for an inferior federal court to declare a cessation of hostilities and order a combatant's release when an American military presence remained in the theater of combat and when the status of combatants, their terms of release, and the mutuality of exchanges may all remain subjects for negotiation and diplomacy. *See Ludecke*, 335 U.S. at 169; *The Three Friends*, 166 U.S. 1, 63 (1897); *The Prize Cases*, 67 U.S. 635, 670 (1862).

branches of our government. For the course on which my dissenting colleague is embarked will trespass, increment by increment, upon those powers, to the detriment of the judiciary's own obligation to respect the proper limits and boundaries of its role.

To claim, as my colleague does here, that there was no meaningful judicial review of Hamdi's detention is incorrect. There was extensive review of every legal challenge to Hamdi's detention. The dissent wishes to proceed further and litigate precisely why petitioner was seized and whether the military capture can be justified. The conduct of war, however, involves innumerable discretionary decisions made by our armed forces in the field every day. Many of them have life or death consequences. To subject these discretionary decisions made in the course of foreign combat operations to the prospect of domestic litigation would be an unprecedented step. Doing so would ignore the fundamentals of Article I and II — namely that they entrust to our armed forces the capacity to make the necessary and traditional judgments attendant to armed warfare, and that among these judgments is the capture and detention of prisoners of war. *See The Prize Cases*, 67 U.S. 635, 670 (1862).

Hamdi's own filings make clear that he was seized in a zone of active combat operations. Hamdi's petition notes that "[w]hen seized by the United States Government, Mr. Hamdi resided in Afghanistan." *See* Petition for Habeas Corpus, p. 2. In their traverse, petitioners state that the petition does not "implicate Respondents' initial detention of Petitioner Hamdi in Afghanistan." *See* Traverse and Response to Respondent's Motion to Dismiss, p. 2. And outside the legal arena, petitioner Esam Fouad Hamdi, in a letter to Senator Patrick J. Leahy, stated that they were "not challenging the battlefield determination, decision to detain individuals in the theater of combat." *See* Letter to Senator Patrick J. Leahy, August 5, 2002. Even the district court, while ordering a more intrusive examination of the circumstances of Hamdi's capture, noted that "[p]etitioners concede that Hamdi's initial detention in a foreign land during a period of ongoing hostilities is not subject, for obvious reasons, to a due process challenge." *See* Order of August 16, 2002, p. 8.[2] Our review of the petition was undertaken in light of this undisputed fact.

---

[2]The above submissions were repeatedly reinforced by Hamdi's counsel in open court. *See*, *e.g.*, "Hamdi[,] as far as I know, is the only

With respect, the dissent's demand for further factual inquiries raises many more questions than it answers. The dissent notes vaguely that it wants a non-hearsay basis for petitioner's detention and that the Mobbs Declaration must be probed for every incompleteness or inconsistency. *Post* at 58. While the dissent appears to acknowledge that the district court production order went too far, its specific criticisms of the Mobbs Declaration suggest otherwise. This desire to have courts wade further and further into the supervision of armed warfare ignores the undertow of judicial process, the capacity of litigation to draw us into the review of military judgments step by step.

The dissent declines to acknowledge the perils in its path, and we are left to guess at how it would proceed. Opposing affidavits would not likely satisfy the dissent, for they would leave the court to weigh

---

[American citizen] out of all the detainees that were gathered up on the battlefield in Afghanistan." (Tr. of Oct. 28, 2000 oral argument at 37); Hamdi's counsel describing as "correct" the district judge's statement that "this man was in a fighting situation. . . . He was where the fight was." (Tr. of Aug. 13, 2002 district court proceedings at 70-71). Indeed, as Judge Traxler's thoughtful opinion indicates, the record is replete with admissions that Hamdi was captured in Afghanistan during hostilities, references that are fully consistent with the panel opinion and that make the locus of Hamdi's seizure susceptible to little more than metaphysical doubt. The fact that the panel may not have specifically quoted all such references in its opinion in no way implies that it rejected their validity.

The dissent makes the contention that Hamdi's father as next friend is incapable of making representations on Hamdi's behalf. *Post* at 62. But the cases my colleague cites in no way involved the constitutional principles implicated by a foreign battlefield capture. *See White v. Joyce*, 158 U.S. 128 (1895); *Kingsbury v. Buckner*, 134 U.S. 650 (1890); *Stolte v. Larkin*, 110 F.2d 226, 233 (8th Cir. 1940). In seeking to deny effect to the filings of the next friend in this case, the dissent's approach would abrogate yet once again the separation of powers by endowing those deemed enemy combatants with rights comparable to those enjoyed by ordinary civil or criminal litigants. And in decrying this reasoning as "dizzyingly circular", *see post* at 62 n.1, the dissent again makes clear that nothing less than a full judicial exploration of the circumstances of petitioner's capture will suffice.

one protestation against the other with little means of doing so. *Ex parte*, *in camera* review would set disputes in motion over the scope of redaction and create a whole new set of secrecy issues surrounding Hamdi's case. *Ex parte*, *in camera* submissions would likely please no one — neither the government required to hand over potentially sensitive materials, nor Hamdi who would be denied the chance to contest an *ex parte* review of them, nor the public who would be left in the dark about the real basis for resolving Hamdi's case. My dissenting colleague also laments the absence of "first-hand knowledge of Hamdi's conduct or status in Afghanistan." *See post* at 65. The dissent is plainly unwilling to trust the judgment of those actually fighting the war that Hamdi was properly seized. What further steps should the judiciary then be prepared to take? What kind of hearings? What role for counsel? What kind of showings? What sort of witnesses? The district court struggled with these questions to ill effect. *See Hamdi*, 316 F.3d at 470-71; *Hamdi v. Rumsfeld*, 243 F. Supp. 2d 527 (E.D.Va. 2002).

My colleague's desire for more and more information signals not the end of a constitutionally intrusive inquiry, but the beginning. To start down this road of litigating what Hamdi was actually doing among the enemy or to what extent he was aiding the enemy is to bump right up against the war powers of Articles I and II. Judges are ill equipped to serve as final and ultimate arbiters of the degree to which litigation should be permitted to burden foreign military operations. The ingredients essential to military success — its planning, tactics, and intelligence — are beyond our ken, and the courtroom is a poor vantage point for the breadth of comprehension that is required to conduct a military campaign on foreign soil.

Because I think it both unreasonable and unfair to expect either judges or attorneys to discard a lifetime of honed instinct, I suspect that in time, if the course of the dissent is followed, the norms of the criminal justice process would come to govern the review of battlefield detentions in federal court. The prospect of such extended litigation would operate to inhibit our armed forces in taking the steps they need to win a war. The specter of hindsight in the courtroom would haunt decision-making in the field. At a minimum, if rules are to be prescribed for litigating something as sensitive as the soundness of battlefield detentions in Article III courts, then the prescription should

come from Congress or the Executive — the branches of government charged by our Constitution with the conduct of foreign war. I cannot conceive of the courts on their own motion — without the considered input of the political branches — devising a set of procedures allowing prisoners of war to hold American commanders accountable in federal court. If any illustration of the difficulties and hazards of such a judicial enterprise were needed, the history of Hamdi's case should more than suffice.

My colleague also interprets a series of World War II-era Supreme Court cases as invitations for the judiciary to involve itself in an exacting review of decisions made on foreign battlefields. *Post* at 60-61. My colleague's overreading of these decisions misses their fundamental import: they are replete with warnings that the judiciary must stay its hand when reviewing an exercise of the Commander-in-Chief powers during wartime. *Ex parte Quirin*, for example, holds without reservation that detentions "ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger" should not "be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted." 317 U.S. 1, 25 (1942). Likewise, *Johnson v. Eisentrager* emphasized that "[e]xecutive power over enemy aliens" — the enemy combatants at issue in that case — "undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security." 339 U.S. 763, 774 (1950); *see also id.* at 778-79 (detailing the crippling complications that would arise from allowing searching judicial review of the petitioners' detention). And *In re Yamashita* noted that the military tribunals challenged in that case were "not subject to judicial review merely because they have made a wrong decision on disputed facts." 327 U.S. 1, 8 (1946). "Such great war powers may be abused, no doubt, but that is a bad reason for having judges supervise their exercise, whatever the legal formulas within which such supervision would nominally be confined." *Ludecke v. Watkins*, 335 U.S. 160, 172 (1948). These cases are caution signals to the judiciary, not green lights.

I seriously doubt that any mistake was made in Hamdi's case. But the Supreme Court in *Ex parte Quirin*, *Johnson v. Eisentrager*, and *In re Yamashita* was fully aware that war was a messy business, that

mistakes could be made, but that close judicial review was nonetheless costly and constitutionally proscribed. And the panel in this case did not seek to move further than the precise case before it. *See Hamdi*, 316 F.3d at 465. To compare this battlefield capture to the domestic arrest in *Padilla v. Bush* is to compare apples and oranges. Moreover, the recharacterizations of the holding in the dissent are manifestly far afield. The panel did not suggest that its holding would apply to any part of the world where American troops might happen to be present. There is not the slightest resemblance of a foreign battlefield detention to the roundly and properly discredited mass arrest and detention of Japanese-Americans in California in *Korematsu*. These attempts to recharacterize the holding of the panel find no support in the opinion's text itself.

Finally, although both the panel opinion and the dissent have noted the evidentiary shortcomings of the Mobbs Declaration, there is a value to having the United States state under oath its reasons for the detention of an American citizen, even one captured during the course of armed combat.[3] To go further, however, would be folly. It is precisely at the point of armed combat abroad that the government's detention interests in gathering vital intelligence, in preventing detainees from rejoining the enemy and in stemming the diversion of military resources abroad into litigation at home are at their zenith. It diminishes these interests to inquire whether the judiciary deems them "legitimate," "substantial," or "compelling," for they are grounded in the wording of Articles I and II themselves. The federal judiciary plays a vital role in securing our rights. But the other branches of gov-

---

[3]My colleague Judge Luttig's dissent attempts to straddle the issue by taking sides with both parties. On the one hand, it asserts that "the panel found itself simply unwilling to allow petitioner Hamdi to challenge the facts supporting his designation by the Executive as an enemy combatant." *Post* at 42. On the other hand, it argues that it is likely that "the facts recited in Special Advisor Mobbs' affidavit, as to which there is not even hint of fabrication, are sufficient to satisfy the constitutionally appropriate standard." *Post* at 57. In all events, the panel had before it the straightforward situation where petitioners' filings repeatedly corroborated the government's assertions that the locus of Hamdi's capture was a zone of active combat operations abroad. Unsurprisingly, the panel addressed the case on the basis of what was before it.

ernment also play their part in securing the blessings of our liberty. In this case, the paramount right is that of the citizens of our country to have their democracy's most vital, life-or-death decisions made by those whom the Constitution charges with that task.

In sum, this petition was properly dismissed.

TRAXLER, Circuit Judge, concurring in the denial of rehearing en banc:

In their dissents from the denial of rehearing, my colleagues have appreciated the nature and magnitude of the competing interests at stake here. However, because I believe that their opinions at times have unfairly and inaccurately characterized the panel opinion, I regrettably find myself drawn to offer a few comments in response.[1]

## I.

Each of my dissenting colleagues argues that the panel erred in premising its decision on the "admission" that Yaser Esam Hamdi was captured within the boundaries of Afghanistan. Judge Luttig questions whether any such admission was made, at least in the petition, and Judge Luttig and Judge Motz both believe that any such admission should be ineffective because it was made by Hamdi's father, Esam Fouad Hamdi, acting as Yaser Esam Hamdi's "next friend," and not directly by Yaser Esam Hamdi.

## A.

I begin with Judge Luttig's charge that the panel opinion "is unpersuasive, because of its exclusive reliance upon a mistaken characterization of the circumstances of Hamdi's seizure as 'undisputed'" because they were not, in his view, "conceded in fact." As an initial premise, I would point out that the panel decision does not characterize *all* the circumstances of Hamdi's seizure as being undisputed. Rather, it characterizes *one* circumstance of Hamdi's seizure as undis-

---

[1]Because Judge Wilkinson has already written eloquently, and primarily, in response to Judge Motz's dissent, I focus my comments chiefly on matters raised by Judge Luttig.

puted — his presence in Afghanistan while active military operations were being waged by the United States military against the governing Taliban regime. Hamdi's reason for being in Afghanistan at the time he was seized and the question as to whether he was indeed actively engaged as an enemy to our forces and this country are very much in dispute. The government asserts that Hamdi was in Afghanistan bearing arms as a Taliban soldier when he was seized; Hamdi's father asserts that Hamdi was only temporarily residing in Afghanistan while engaged in relief work when he was apprehended. Thus, the panel opinion's observation is in reality limited to the simple fact that "Hamdi was captured in a zone of active combat in a foreign theater of conflict." *Hamdi*, 316 F.3d at 459.[2]

As to this more narrow point of disagreement, Judge Luttig correctly observes that the habeas petition does not *explicitly* state that "Hamdi was captured in a zone of active combat in a foreign theater of conflict." *Id*. However, from this single pleading omission, Judge Luttig inexplicably leaps to the conclusion that the remaining petition allegations are ambiguous on the question (or, worse, that we should ignore them) and, even more inexplicably, to the belief that when responding to a dissent to a denial for rehearing en banc, the panel has somehow forfeited a right to point to any other pleading or representation filed or otherwise made *by the petitioner* that supports the observation, unremarkable when made, that Hamdi was indeed in Afghanistan when captured.

First, the petition's failure to affirmatively state that Hamdi was captured in a foreign combat zone did not and still does not compel me to ignore the other allegations that are present, nor does it cause me to consider that the place of Hamdi's capture is a matter of dispute. As Judge Wilkinson has pointed out, the petition alleges that

---

[2]*See also Hamdi*, 316 F.3d at 460 (noting that the petitioner "acknowledg[ed] that Hamdi *was seized in Afghanistan* during a time of active military hostilities") (emphasis added); *id.* at 461 (noting that it was "undisputed that Hamdi *was captured in Afghanistan* during a time of armed hostilities there") (emphasis added); *id.* at 474 (noting that "Hamdi's petition *places him* squarely within the zone of active combat") (emphasis added); *id.* at 476 (noting that "it is undisputed that [Hamdi] was captured in a zone of active combat operations").

"[w]hen seized by the United States Government, Mr. Hamdi resided in Afghanistan." J.A. 9.[3] Were this the only allegation made, I suppose I could speculate about whether Hamdi had traveled from his "reside[nce] in Afghanistan" to another country "when [and where he was] seized by the United States Government," but I need not do so. *Id.* Significantly, the one statement quoted above is not the only allegation made; the petition provides a great deal more information than that. It avers that, following the terrorist attacks on September 11, 2001, "the United States initiated military action against the Taliban Government in Afghanistan," and that, "in the course of the military campaign, . . ., the United States provided military assistance to the Northern Alliance." J.A. 10. As a result of this military assistance in Afghanistan, the petition states that

> the United States obtained access to individuals held by various factions of the Northern Alliance. On information and belief, Mr. Hamdi was captured or transferred into the custody of the United States in the Fall of 2001.

J.A. 10. It goes on to allege that "[o]n or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantanamo Bay, Cuba," and that on or about that same date, "the United States military transferred Yaser Esam Hamdi to Camp X-Ray, Guantanamo Bay." J.A. 11.

When we authored the panel opinion, I did not consider these petition allegations to be ambiguous, nor do I today. A plain reading of the submission to us made clear that Esam Fouad Hamdi, as next friend to Yaser Esam Hamdi and as his father, based his claims in large part on the fact that Yaser was seized in Afghanistan in the course of the United States military operations within that country. His contention was that the United States military should release Yaser because he was not in Afghanistan to fight us or our allies and,

---

[3]According to later representations made by his father, Hamdi left "Saudi Arabia for Pakistan and then Afghanistan on July 15, 2001 to do relief work in those countries," and became "trapped in Afghanistan once the military campaign began." J.A. 153.

therefore, was not *properly* being held as an "enemy combatant" by our military forces.

There was not then and there is not now any reason to be troubled by the lack of an *explicit* allegation in the petition that Hamdi was seized in a zone of active combat in a foreign theater of conflict, because any possible question about whether the petition was incomplete or uncertain in its intent to allege that Hamdi was actually one of the prisoners captured and detained in Afghanistan would have been eliminated by Hamdi's Traverse and Response to the government's motion to dismiss, in which the petitioner engages in his own characterization of the substance of the factual allegations and the claims contained within the petition.

There, the petitioner unequivocally represents that the "claim [does not] implicate Respondents' initial detention of Petitioner Hamdi *in Afghanistan*," but "challenges only his current indefinite imprisonment in the United States Naval Brig in Norfolk, Virginia" and that, because petitioner did not contest the initial detention of Hamdi in Afghanistan, "Hamdi's claims have no practical consequences for the conduct of the military overseas." J.A. 64-65.[4] I do not see how the petitioner could be any clearer. He acknowledged that "[a]ccording to *both* the Petition *and* the Mobbs Declaration, Petitioner Hamdi was captured by the Northern Alliance and transferred into the custody of the United States in the Fall of 2001 or late 2001," J.A. 67 (emphasis added), represented that "[i]n January 2002, Respondents transported Petitioner Hamdi from Afghanistan to Guantanamo Bay, Cuba," J.A.

---

[4]We have also been challenged for our alleged "altered and paraphrased rendition" of the petition's allegation concerning the location of Hamdi's seizure. We did interpret the petition as alleging that "'Hamdi was captured or transferred into the custody of the United States in the Fall of 2001' *in Afghanistan*." *Hamdi*, 316 F.3d at 460 (emphasis added); *see* J.A. 10. But, even if we assume that the petition was ambiguous on this point, we did not "suppl[y] a geographical location of [Hamdi's] seizure and detention" nor "imput[e] a representation as to this location to the next friend," as charged by Judge Luttig; the next friend supplied the geographical location. Any ambiguity as to whether Hamdi was captured or transferred to the United States military in Afghanistan was likewise cleared up by the next friend's own characterization of his claim.

69, and complained that Hamdi was being punished by his "isolat[ion] from others similarly situated in Afghanistan and Guantanamo Bay, Cuba." J.A. 71.[5]

Additionally, as Judge Motz has observed in her dissent, we had been presented in the Joint Appendix with a letter written by Hamdi's father to United States Senator Patrick Leahy (which *petitioner* had submitted to the district court). In the letter, Hamdi's father stated that Yaser had "left our home in Saudi Arabia for Pakistan and then Afghanistan on July 15, 2001 to do relief work in those countries," "was trapped in Afghanistan once the military campaign began," and "was caught up in a local dragnet of non-Afghans in Mazar-e-Sharif in Afghanistan in November 2001" along with John Walker Lindh. J.A. 153. He was then "kept in [an] Afghanistan jail for 2-3 months prior to being moved to Guantanamo Bay where he stayed for 2 months before they confirmed that he [was] an American citizen, then they moved him to the Norfolk jail." J.A. 154. At no time was it ever hypothesized that Hamdi might not have been in Afghanistan when he was seized. Indeed, it was affirmatively represented that Hamdi

---

[5]Consistent arguments were also made to this court. For example, Hamdi argued that no deference was due the Respondents because, *inter alia*, "Hamdi's claims do not challenge the conduct of foreign policy, military decision-making, or even the propriety of his initial detention in Afghanistan," but instead challenge "the legality of his indefinite detention in a Norfolk naval brig without due process." Appellees' Brief at 27. Later, it was again represented that "Hamdi's claims do not require review of Respondents' prosecution of the war effort. As noted earlier, Hamdi's claims do not seek judicial review of the Executive Branch's conduct overseas." Appellees' Brief at 40. At yet another point, Hamdi argued that the "Respondents [had] mischaracteriz[ed] Hamdi's claims as an effort to 'second-guess[ ] the military determination' of his enemy combatant status," representing that "[o]n the contrary, the underlying claims in this case are designed to test the legality of Hamdi's imprisonment in a naval brig in Norfolk, Virginia, not a military determination made overseas. . . ." Appellees' Brief at 44. And, during oral argument, Hamdi again clarified that he was *not* challenging the legality of his initial seizure and detention *in Afghanistan* as an enemy combatant, but rather was only asserting that as one moves away from a foreign battlefield to the United States where civil courts are open and functioning, the deference due to the military's battlefield decision decreases.

was "caught at the same time Mr. John Walker Lindh was caught" in Afghanistan, but that he was "not [being] treated the same way," and was not properly determined to be "an enemy combatant." J.A. 154.[6]

In keeping with affirmative representations made to the court, at no time did anyone on either side of this controversy aver or allege that Hamdi was anywhere other than Afghanistan when he was captured or detained by the Northern Alliance or when he was turned over to the United States military. Judge Luttig has not pointed to a single contrary allegation. Nor did Hamdi's most capable counsel "gratuitously or foolishly concede that his seizure occurred in a foreign zone of combat," as Judge Luttig might have us believe. The case has at all times been litigated by counsel based on the consistent position of Hamdi's father that his son was in Afghanistan and was captured there by our military, but that he was not there as an enemy combatant. Even in his petition for rehearing and rehearing en banc, Esam Hamdi did not assert that Yaser was somewhere other than in Afghanistan when seized; on the contrary, the petition *affirmatively acknowledges* that Hamdi's presence in Afghanistan is indeed an "undisputed" fact. The petition seeks a remand in order to allow Yaser Hamdi the opportunity to meet with counsel and contradict the government's assertion that he *was in a zone of combat operations* within the country of Afghanistan. Again, the petition seeks to litigate the factual question of *why* Hamdi was in Afghanistan when he was seized and, more precisely, whether he was actively engaged as an enemy to our forces, not *whether* he was in Afghanistan during wartime.

I cannot base a decision in so momentous a case on the theoretical possibility that the general allegations in the petition — that the United States obtained access to Hamdi and other prisoners in the custody of the Northern Alliance in Afghanistan and transferred these prisoners "captured in Afghanistan" to Guantanamo Bay — are wrong and do not apply to Hamdi's situation. Indeed, it would be ludicrous for us to somehow presume that they were not intended to be believed. Nor do I know of any precedent that would prompt us here to ignore the factual representations made by the petitioner and coun-

---

[6]*See United States v. Lindh*, 227 F.Supp.2d 565 (E.D. Va. 2002); *United States v. Lindh*, 212 F.Supp.2d 541 (E.D. Va. 2002); *United States v. Lindh*, 198 F.Supp.2d 739 (E.D. Va. 2002).

sel in support of the petition. Because the government moved to dismiss the petition, I have assumed the factual allegations of the petition to be true and, for that matter, have accepted the petitioner's in-court representations regarding how they were intended to be interpreted. I am unfamiliar with any principle that would require us to assume that the factual allegations and in-court representations made by the petitioner *and* the government are false, and none has been cited to me. Indeed, it would seem inappropriate for us to impute such strange intentions to Hamdi's father and his counsel. *Cf. S. Cross Overseas Agencies v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 428 n.8 (3d Cir. 1999) (employing a "reasonable reading of the complaint" to supply an allegation not expressly made by the plaintiffs).

Petitioner's position has remained quite constant throughout this appeal — that, because Hamdi is an American citizen by birth, he was entitled to meet with appointed counsel in order to contest the factual basis underlying the military's designation of him as an enemy combatant, as opposed to a peaceful resident, in Afghanistan — *once he was removed from the battlefield*. We found this position untenable, holding (for a great many reasons which I need not reiterate here) that when an American citizen is captured in an enemy country where we are engaged in active hostilities, we will require no more legal justification than what the government voluntarily provided to us in this case. I am still of the belief that this is the proper and legal course of analysis. And I reject, with little hesitation, this bemusing attempt to rewrite the case history and the substance of the habeas claim placed before us.

## B.

I likewise disagree with Judge Luttig's belief, shared by Judge Motz, that Hamdi's capture in Afghanistan is not "susceptible to concession in law because Hamdi has not been permitted to speak for himself or even through counsel as to those circumstances." I am also cited to no authority for the proposition that we should ignore or disbelieve the petitioner's allegations that Hamdi was taken into military custody in Afghanistan during the combat operations being waged there at the time (whether made expressly in the petition, by implication from its allegations, or by virtue of the petitioner's representa-

tions as to the intended meaning of the allegations) merely because the allegations were not personally written by Yaser Hamdi.

Indeed, a next friend does have the power to admit facts on behalf of the real party in interest, subject to the supervision of the court. *See Hall v. Hague*, 34 F.R.D. 449, 450 (D. Md. 1964). Were it otherwise, a next friend might be compelled to contest every fact which might be relevant, thereby creating unnecessary trouble and expense for the parties and the court. *See id.* at 449-50. Or, the mere filing of a next friend petition challenging civil disabilities might compel the lifting of such disabilities so that the real party in interest might participate fully in the litigation. The latter possibility is particularly ominous in a case such as this, as it would enable an alleged enemy combatant to disrupt, with no showing whatsoever, safeguards that the Executive has determined are necessary to protect vital national security interests.[7] In sum, I do not believe the panel erred in construing the petition to admit that Hamdi was captured in Afghanistan and in giving effect to that admission.

### C.

This brings me, regrettably, to Judge Luttig's accusation that Judge Wilkinson and I have "attempt[ed] to save the panel opinion by marshaling for the first time today additional support, beyond that relied upon by the panel, for the panel's conclusion that it has been conceded that Hamdi was seized in a foreign combat zone." In a series of charges, Judge Luttig complains that Judge Wilkinson's concurrence "makes reference not only to the next friend petition upon which the panel solely relied, . . . but also to the new materials cited by the government in its response to the petition for rehearing in sup-

---

[7]The cases cited by Judge Motz do not compel a contrary conclusion. *See White v. Miller*, 158 U.S. 128, 146 (1895); *Kinsbury v. Buckner*, 134 U.S. 650, 680 (1890); *Stolte v. Larkin*, 110 F.2d 226, 233 (8th Cir. 1940). The cases do not translate to a holding that the court, as opposed to the next friend, is charged with the duty to rewrite a claim brought by a next friend on behalf of a military detainee so as to assure its survival. Here, there is no reason to believe that rights are being bargained away or that a factual mistake is being made. There is surely no doubt as to the nature of the claim before us.

port of the court's conclusion that the location of seizure has been conceded, [including] Petitioner's Traverse and Response to Respondent's Motion to Dismiss filed in the district court. . . .", charges that this is but another example of "the trend in our court to attempt 'to add to, subtract from, or recharacterize the facts recited and relied upon in a challenged panel opinion,'" and presumes that our reliance upon petitioner's representations made about his petition is but an improper attempt to "shore up" our joint panel opinion because the panel now "senses . . . analytical softness of its opinion."

First, I can state without hesitation that I have no "sense" that our decision is analytically soft at all. On the contrary, the dissent's failure to point to a single allegation or statement in the record of this case that creates a dispute as to where Hamdi was when he was seized or detained by our allies or our own military forces should end the discussion.

Second, Judge Luttig appears to have forgotten his characterization of our panel opinion as a "challenged panel opinion," albeit *challenged* in the form of the dissents written by Judge Luttig and Judge Motz to the full court's vote *not* to rehear the case en banc. Judge Luttig's criticism appears to be premised upon a belief that when panel members write in response to a dissent to a denial of rehearing en banc, it is improper for them to refer to anything in the original record which was not specifically referenced in the panel decision, as this would amount to "supply[ing] . . . important new facts or reasoning" not susceptible to appellate review. Such "additional support," Judge Luttig asserts, became "irrelevan[t] as a matter of law given that they were not relied upon in the panel opinion."

Obviously, any response by a panel, unanimous at the time the decision was rendered, to a dissent from a denial of rehearing en banc might be construed as an act of bolstering or "shor[ing] up" the published opinion in some sense. Otherwise, there would be nothing to say. Yet, I find no reason to remain silent when our opinion is being misinterpreted. I am confident that neither Judge Wilkinson nor I have informally "modif[ied]" the panel decision which we, along with Judge Wilkins, so painstakingly authored together. It is not my opinion-writing practice to recite every source of information contained within a joint appendix, nor every source directly relied upon

in arguments. Indeed, there is rarely, if ever, a need to clutter an opinion with record support for uncontroversial statements that the parties have not contested in their pleadings, responses, briefs, or arguments.

In any event, I see no need to modify the panel opinion because we have pointed to no "important new facts or reasoning." We observed in the panel opinion that the habeas petition before us for disposition placed Hamdi in an enemy country when he was seized and detained by our military forces as an enemy combatant. In response to Judge Luttig's charge that the language of the petition does *not* place Hamdi in Afghanistan at the point of seizure, Judge Wilkinson and I have only gone so far as to point out that any question as to whether we have properly characterized the claims can be laid to rest by petitioner's own characterization of those allegations. Neither of us has pointed to anything that has not at all times been a part of the record and entirely consistent with the petition's allegations outlined above.[8]

---

[8]For this reason, I also think it misleading to characterize the Traverse and Leahy letter as "new materials cited by the government in response to the petition for rehearing in support of the court's conclusion that the location of seizure has been conceded." These materials have been in the district court record and in the Joint Appendix since the inception of the appeal, and have been referred to by the parties throughout this litigation. There is nothing "new" about them.

With specific regard to Esam Hamdi's letter to Senator Leahy, we are additionally confronted by Judge Motz's view that it was improperly "ignored" by us and Judge Luttig's belief that it should have been ignored because it is "obviously irrelevant" to the issue. We considered everything submitted by the parties in the Joint Appendix and all of the arguments when authoring our joint opinion. We did not ignore the Leahy letter or find it to be "obviously irrelevant." The letter was presented to the district court by Hamdi's counsel, along with several other documents. The panel did not expressly cite to the letter to support the observation that Yaser Esam Hamdi was captured in a combat zone. But, like the Traverse (and other representations made below and at oral argument before this court), the Leahy letter was perfectly consistent with the unremarkable observation which we drew from the allegations of the petition before us and as they had been represented to us, *i.e.*, that Hamdi was indeed in Afghanistan when he was seized. It certainly did not raise any ambiguity in the petition concerning Hamdi's location when he was seized.

II.

I turn next to Judge Luttig and Judge Motz's shared belief that we have placed undue significance on the fact that Hamdi was seized in a foreign combat zone in evaluating the legal sufficiency of the Mobbs Declaration and, by doing so, have somehow paved the way for widespread deprivation of the individual constitutional rights of our citizens.

First, we have not pulled the significance of this simple fact from thin air. It is grounded in the time-honored rule of law in wartime — that all persons residing in an enemy country during hostilities are deemed to be enemies, regardless of nationality. *See Juragua Iron Co. v. United States*, 212 U.S. 297, 305-06 (1909). "[U]nder the recognized rules governing the conduct of a war between two nations, . . . all persons, whatever their nationality, who reside[ ] [in the enemy country [are], pending such war, to be deemed enemies of the United States and all of its people." *Id.*; *see also Lamar v. Browne*, 92 U.S. 187, 194 (1875); *Young v. United States*, 97 U.S. 39, 60 (1877). This is not to say that all persons residing within the enemy country are *in fact* enemies, or specifically that Hamdi was necessarily an enemy combatant merely because he was in Afghanistan during a conflict between the United States and the Afghan government. But, significant consequences necessarily attached to Hamdi's presence in Afghanistan; his individual rights stood in tension with the Executive's wartime powers under Article II. Consequently, the Judiciary became compelled, by the nature of war and by dint of the separation of powers we are required to safeguard and honor, to give deference to the Executive to determine who within a hostile country is friend and who is foe.[9]

---

[9]In his petition for rehearing and rehearing en banc, petitioner argued it could only be said to be undisputed that Hamdi was in a zone of active combat operations if the entire country of Afghanistan is such a zone at the time of capture. I have no problem with this view. The United States is in a sanctioned military operation designed to oust from power the governing regime of the country of Afghanistan. Just as we "are ill-positioned to police the military's distinction between those in the arena of combat who should be detained and those who should not," *Hamdi*, 316 F.3d at 474, we are ill-positioned to question the military's determination that any particular area of a country with whom we are at war is or is not an "active combat zone."

Second, Judge Motz and Judge Luttig's collective fear that our recognition of this time-honored principle might result in innocent journalists or unwitting tourists falling victim to unreviewable military detentions anywhere in the world can be easily laid to rest. Judge Motz, for example, asserts that our decision would allow "any of the 'embedded' American journalists covering the war in Iraq or any member of a humanitarian organization working in Afghanistan, [to] be imprisoned indefinitely" by our military, that "any American citizen seized in a part of the world where American troops are present — *e.g.*, the former Yugoslavia, the Philippines, or Korea — could be imprisoned indefinitely, merely by asserting that the area is a zone of active combat," and the even more extreme "fear that the panel may also have opened the door to the indefinite detention, without access to a lawyer or the courts, of any American citizen, *even one captured on American soil*, who the Executive designates an 'enemy combatant,' as long as the Executive asserts that the area in which the citizen was detained was an 'active combat zone,' and the detainee, deprived of access to courts and counsel, cannot dispute this fact." Judge Luttig also points to "[t]he embedded journalist or even the unwitting tourist" who "could be seized and detained in a foreign combat zone." And, he too claims that such a likelihood would be "far from infinitesimal where the theater is global, not circumscribed, and the engagement is an unconventional war against terrorists, not a conventional war against an identifiable nation state."

Although effective in stirring emotion, our colleagues' expressed fears are grounded in conclusions not reached or even predicted by the panel decision. Our decision does not speak to the issue of whether an "enemy combatant" may challenge the government's claim that the former Yugoslavia, the Philippines, or Korea is a zone of active military operations for purposes of the President's exercise of his Article II war powers. Rather, it addresses only the appropriate level of deference to be observed when the President exercised his power to detain an American citizen found within the boundaries of Afghanistan during our military efforts to overthrow its governing regime. Nor does it sanction indefinite detention, but rather contemplates detention for the duration of such hostilities.

In short, my colleagues' collective desire (albeit undertaken for much different reasons) to redefine the case before us has caused

them to lose their focus on our holding. Afghanistan is an identifiable nation state and Hamdi was in a conventional war situation. Every resident within Afghanistan (including Hamdi as was explicitly alleged) was in law an enemy, until determined by the Executive to be a friend. As Judge Wilkinson aptly observed, war is a messy business and mistakes can be made. American journalists and American tourists who venture into a country with whom we are at war without the approval of our military, or who fail to return to this country in time of war, necessarily expose themselves to many risks, including this one. But the circumstances of armed conflict against a foreign government in a foreign land require the deference we have shown the Executive in the making of military decisions.

### III.

Despite their common criticism of our observation that Hamdi was captured in Afghanistan — and our belief that Hamdi's capture in Afghanistan guides our inquiry as to whether the Mobbs Declaration is sufficient to justify Hamdi's detention as an enemy combatant — our colleagues differ significantly in their opinions as to what kind of review is appropriate.

Judge Motz would hold that the Mobbs Declaration is *insufficient* to justify Hamdi's enemy combatant designation. And, although she disagrees that Hamdi's capture in Afghanistan is undisputed, in the end it really matters not to Judge Motz whether Hamdi was seized in Afghanistan. As Judge Wilkinson has noted, Judge Motz believes it proper for the Judiciary to litigate precisely why Yaser Hamdi was seized and whether the military capture can be justified regardless of where the seizure occurred. In short, Judge Motz "would require a greater showing from the Executive before [she] would permit an American citizen, held in the United States, to be imprisoned indefinitely, without ever being afforded the opportunity to appear in court, contest the allegations against him, or consult with a lawyer." For the reasons expressed by Judge Wilkinson, I, of course, disagree.

Judge Luttig also contests our observation that Hamdi was present in Afghanistan when he was captured, but only pays lip service to Judge Motz's belief that we would have to give Hamdi access to counsel and a direct voice in an Article III court in order to determine

his place of seizure. Unlike Judge Motz, it appears that Judge Luttig would in practice not give Hamdi a voice to either concede or dispute the place of seizure. Rather, Judge Luttig "believe[s]" he would adopt at most a "some evidence" standard as the appropriate level of deference due and "would likely conclude, as argued by the United States, that the facts recited in [the Mobbs' Declaration] are sufficient" to satisfy it. In other words, it seems Judge Luttig would hold that the Mobbs Declaration is *sufficient* to justify Hamdi's enemy combatant designation *regardless* of whether Hamdi admitted his presence in Afghanistan or flatly disputed it.

From this, I can only assume that Judge Luttig is really dissatisfied not because we have refused to give Hamdi a voice to raise a dispute as to his place of seizure, but because we evaluated the legal sufficiency of the government's response within the context of Hamdi's capture in Afghanistan. Thus, Judge Luttig charges, by "refus[ing] to rest decision on the proffer made by the President of the United States" and instead "rest[ing] decision on a putative concession by the detainee," we have "all but eviscerate[d] the President's Article II power to determine who are and who are not enemies of the United States during times of war." He accuses us of "disown[ing] [our] promise to the Executive to accord him the substantial deference to which he is constitutionally entitled for his wartime decisions as to who constitute enemies of the United States," and predicts that our rule "will henceforth . . . cast the Judiciary as ultimate arbiter, in each and every instance, of whether the Executive has properly so classified a detainee." "[I]n every instance in which the [habeas] petitioner refrains from affirmative concession that he was seized in a foreign combat zone," Judge Luttig laments, "counsel must now be provided and judicial review had of the Executive's determination that one is an enemy combatant." Such hyperbole is not only unwarranted, it is plainly wrong.

Judge Luttig's first misrepresentation lies in his characterization of our opinion as holding that "more is 'unnecessary to a meaningful judicial review' of a challenge to an Executive's enemy combatant designation than a concession of seizure in a foreign combat zone." We have held no such thing, nor can such be fairly read from our opinion. The inaccuracy of this "paraphrased rendition" of our holding is readily apparent. The language quoted by Judge Luttig from the

panel opinion is excised from the following passage from our opinion which follows an extensive discussion of the contents of the Mobbs Declaration and the practical problems of active judicial supervision of combat operations overseas:

> [B]ecause Hamdi was indisputably seized in an active com-
> bat zone abroad, we will not require the government to fill
> what the district court regarded as gaps in the Mobbs affida-
> vit. The factual averments in the affidavit, if accurate, are
> sufficient to confirm that Hamdi's detention conforms with
> a legitimate exercise of the war powers given the executive
> by Article II, Section 2 of the Constitution and . . . is consis-
> tent with the Constitution and laws of Congress. *Asking the
> executive to provide more detailed factual assertions* would
> be to wade further into the conduct of war than we consider
> appropriate and *is unnecessary to a meaningful judicial
> review* of this question.

*Id.* at 473 (emphasis added) (citations omitted). Obviously, we did not hold that Hamdi's concession of seizure in a foreign combat zone rendered further judicial inquiry into an enemy combatant designation unnecessary. For the constitutional and practical reasons extensively discussed in the opinion, we held that Hamdi's presence in a war zone when seized rendered judicial inquiry *beyond* the legal sufficiency of the government's response unnecessary to a meaningful judicial review.

Indeed, we expressed *no* opinion as to whether the Mobbs Declaration was more than sufficient or just enough to ensure meaningful judicial review of the Executive's detention of an American citizen in an enemy country as an enemy combatant. The submission of the Mobbs Declaration was not directed by the Judiciary. Rather, the government voluntarily opted to provide, under oath, a level of information it believed to be legally sufficient to justify detention of an American citizen captured during the course of armed conflict in a foreign theater of battle, and asked us to respect the balance of powers and accept it as sufficient to warrant dismissal of the petition before us. And, we did indeed accept the Executive's voluntary proffer as sufficient. We took care not to make grand pronouncements as to what we might do in a different case, and even went so far as to

expressly discourage any propensity on the part of others to view our decision as moving beyond the set of circumstances before us. Judge Luttig decries what he believes to be a "Pyrrhic victory" for the government, but it has lost nothing. Even if we assume that the government sought such a broad holding, the most that can be said is that they did not get all they wanted and must seek it elsewhere.

Judge Luttig's second misrepresentation comes in the form of the prediction that, as a result of our opinion, "in every instance in which the [habeas] petitioner refrains from affirmative concession that he was seized in a foreign combat zone," "counsel must now be provided and judicial review had of the Executive's determination that one is an enemy combatant." Our opinion says no such thing. We held that the Mobbs Declaration was sufficient to allow meaningful judicial review of Hamdi's detention because he was within a hostile country when captured. We did not predict what would constitute meaningful judicial review of the detention of an United States citizen in cases in which the place of seizure is unknown or alleged to be within a country with whom we are not actively at war. Although we left open the possibility that the place of seizure might require further factual inquiry depending upon what representations the government provided, we did not hold that extended judicial review of the Executive's determination *that one is an enemy combatant* would become appropriate merely because a dispute existed *as to the place of capture*. Nor for that matter, did we even hold that the Mobbs Declaration would have been insufficient had the place of capture been in dispute in this case. Our opinion dealt, as it should, with the precise situation before us.

## IV.

Finally, while I fully recognize that we have not gone as far as Judge Luttig would have us go, I take umbrage at his charge that this panel, as a result of "decisional paralysis," has "retreated" from its constitutional duty to decide this case based upon the facts presented and, instead, has fabricated a fact to ease our task. Nothing could be further from the truth. The government makes no such charge, no doubt cognizant that, in accordance with time-honored principles of constitutional decision-making, we have gone no further than necessary to resolve the delicate balance of constitutional interests before

us. *See Poe v. Ullman*, 367 U.S. 497, 503 (1961) ("The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of strictest necessity.") (quoting *Parker v. County of Los Angeles*, 338 U.S. 327, 333 (1947)); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) ("The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.'") (quoting *Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Commissioners*, 113 U.S. 33, 39 (1885)); *id.* ("The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"). *Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."). Nor, for that matter, does the petitioner, who argues not that Yaser's presence in Afghanistan was a matter of dispute, but only that we should not as a legal matter rely upon the allegations of the petition and the representations of the petitioner for the premise that Yaser was in an active combat zone within that country.

Nor is it fair to say that we "retreated to ground that . . . neither party attempted to defend." The government has recognized the significance of the place of capture from the outset of this case, arguing to us that "[t]he military determination at issue in this case — the decision to detain someone who was armed with an assault rifle when he surrendered *in a combat zone* as part of an enemy unit — directly implicates the national defense, not to mention the safety of American soldiers still stationed *in the zone of conflict*, and falls at the heart of the military's ability to conduct war." Respondents' Brief at 27. So has the petitioner, who has repeatedly disclaimed any intent to challenge a battlefield seizure in Afghanistan, but only Hamdi's current detention in the United States.

This case was presented to us on appeal from the district court's order finding that the Mobbs Declaration was insufficient to allow meaningful judicial review of Hamdi's classification as an enemy combatant. We held that the Mobbs Declaration provided by the government in response to the habeas petition was sufficient to uphold Hamdi's detention as an enemy combatant under the President's wartime powers. We have upheld the President's Article II power as Commander in Chief of the armed forces to defend this country from

its enemies and to determine who are and who are not enemies of the United States within countries where we are engaged in active hostilities.

Yaser Hamdi's status as an American citizen entitles him to petition the Judiciary personally, or by next friend if he cannot for reasons of national security, for habeas relief and thereby to demand a response from the Executive as to why the detention is an acceptable utilization of his Article II powers. In the exercise of our Article III powers, we review that response and may consider any legal arguments as to why the detention does not comport with a lawful exercise of war powers. Because Hamdi was within a country with whom we were fighting when he was seized, principles of separation of powers and practicalities of armed conflict dictate that we defer to the Executive's determination as to who is foe and who is not. Hamdi may test the legal basis for his detention. But, beyond that, Hamdi may be held, not indefinitely, but for the duration of active hostilities just like other non-citizen detainees captured in an enemy country by our military forces making a battlefield determination that the person detained was there to take up arms against our soldiers. And, in the holding most overlooked but most directly applicable to the claim as it was filed and argued before us, Hamdi's transfer by the military from the enemy country to Guantanamo Bay and then to the United States did not result in a greater right to challenge his designation.

In the end, Judge Luttig complains not because we accepted the Mobbs Declaration as sufficient and, thereby, granted the President the deference he sought from us. Rather, he complains because we have not forecast a similar level of deference in other contexts by adopting a global standard of review for all Executive detentions undertaken in the "war against terror." But, in order to reach this broader holding, he must attempt to find fault with our observation that Hamdi was in Afghanistan when seized, and he must characterize, however inaccurately, our opinion as resting *solely* upon that observation.

The impropriety of reaching beyond this case to decide another is, in my view, quite obvious. Judge Luttig opines that he would probably adopt the "some evidence" standard advanced by the government and hold that the Mobbs Declaration would be sufficient even in the

face of a factual dispute as to whether Hamdi was in Afghanistan. That question, however, does not merely raise a single difficult issue, as posited by Judge Luttig, as to what the global standard should be for this and other cases. Rather, it raises many difficult issues related to the President's Article II wartime powers and how they will ultimately be interpreted in an age of terror. And, no matter how interesting such questions may be, they are simply not before us. We are not dealing with the President's designation of Hamdi as an enemy combatant because he is a terrorist in the "war against terror" declared after the tragic events of September 11, 2001. Had Hamdi's petition been grounded in an allegation that he was seized in France under the auspices of the "war against terror," and had the military agreed to that allegation and designated him an enemy combatant, then we would have a much different case. Had Hamdi's petition been grounded in an allegation that he was seized in the United States under the auspices of the "war against terror," and the government agreed, then we would have a case not unlike *Padilla v. Bush*.[10] In both hypothetical situations, we might well be called upon to weigh other important national security interests. Whereas we would not likely face the dilemma of pulling military commanders out of the theater of war to testify in a court of law, for example, we would likely encounter such issues as whether France or the United States is a "zone of active military operations" and, if not, whether such seizures in a noncombat country can be a valid exercise of the Executive's Article II war power.

I need express no opinion on such issues because they are not before us. As the government's response to the petition makes clear, we are dealing with the President's designation of Hamdi as an enemy combatant in the war against Afghanistan with the stated goal of ousting the Taliban regime in order to end its support for Al Qaida and other terrorist networks. The conflict in Afghanistan is certainly related to the global conflict referred to as the "war against terror," but it is unquestionably a military conflict that falls quite neatly within our historical concepts of war. The questions Judge Luttig wishes to address might include some of the more novel, complex, and interesting ones a court could be called upon to contemplate, but no matter

---

[10]*See Padilla v. Bush*, 243 F.Supp.2d 42 (S.D.N.Y. 2003); *Padilla v. Bush*, 233 F.Supp.2d 564 (S.D.N.Y. 2002).

how much we might like to deal with them, they are not before us. We should not reach beyond this case to decide them.

LUTTIG, Circuit Judge, dissenting from denial of rehearing *en banc*:

As should be true under a rule of law, the reasoning underlying our resolution of the important issue presented by this appeal has implications beyond the particular dispute before us. In this instance, those implications are for no less commanding constitutional interests than the President's power to conduct war and the right of our citizens to be free from governmental restraint except upon lawful justification.

As my colleagues have recognized, the panel's opinion resolving the important issue presented by this suit is unpersuasive, because of its exclusive reliance upon a mistaken characterization of the circumstances of Hamdi's seizure as "undisputed," when those circumstances are neither conceded in fact, nor susceptible to concession in law, because Hamdi has not been permitted to speak for himself or even through counsel as to those circumstances. That the panel opinion is unpersuasive is borne out by no less significant a fact than that the panel itself, as evidenced by the two separate concurrences today, cannot even now agree as to either the proper interpretation or defense of its opinion.

Additionally, beyond the opinion's unpersuasiveness, its refusal to rest decision on the proffer made by the President of the United States, and its insistence instead upon resting decision on a putative concession by the detainee, has yielded reasoning that all but eviscerates the President's Article II power to determine who are and who are not enemies of the United States during times of war.

Because of the facial unpersuasiveness of the court's opinion, and because the opinion of law that resolves the issue raised in this appeal is of even greater constitutional importance than the result reached by that opinion, I would grant the requested rehearing *en banc*. I believe that the significance of the issue that has been presented calls for an opinion from this court that directly addresses that issue and resolves it unambiguously and convincingly (however broadly or narrowly), based upon the facts as they appear in the record and the arguments as they have been well made by the parties.

## I.

On the central question presented in this case, it is evident that the panel found itself simply unwilling to allow petitioner Hamdi to challenge the facts supporting his designation by the Executive as an enemy combatant, under any standard of review urged by those who appeared on behalf of Hamdi. However, the panel was equally unwilling either to adopt the "some evidence" standard and accept as sufficient under that standard the facts offered by the government as justification for Hamdi's seizure or to hold that the Judiciary is without all authority to review the President's designation of an individual as an enemy combatant, as alternatively urged by the government. Faced with this decisional paralysis, the panel retreated to ground that not only neither party attempted to defend, but that is transparently indefensible — holding that Hamdi cannot challenge, and the court cannot question, the facts proffered by the government in support of Hamdi's particular seizure and detention as an enemy combatant, for the asserted reason that Hamdi has *conceded* that he was seized in a foreign combat zone.

### A.

In resting its decision on this factually and legally untenable ground, the panel reneged on the promises it hastily made to the parties at the litigation's inception.

It promised the citizen seized by the government "meaningful judicial review" of his claim that he was not an enemy combatant, pointedly refusing to "embrac[e] a sweeping proposition — namely that, with no meaningful judicial review, any American citizen alleged to be an enemy combatant could be detained indefinitely without charges or counsel on the government's say-so." *Hamdi* v. *Rumsfeld*, 296 F.3d 278, 283 (4th Cir. 2002) ("*Hamdi II*"). But it ultimately provided that citizen a review that actually entailed absolutely no judicial inquiry into the facts on the basis of which the government designated that citizen as an enemy combatant.

One could hardly be faulted for wondering why, as the panel held, more is "unnecessary to a meaningful judicial review" of a challenge to an Executive's enemy combatant designation than a concession of

seizure in a foreign combat zone. Under even an exceedingly deferential standard of review, such, though it is relevant to, would hardly seem dispositive of whether one has been legitimately classified as an enemy combatant. The embedded journalist or even the unwitting tourist could be seized and detained in a foreign combat zone. Indeed, the likelihood that such could occur is far from infinitesimal where the theater is global, not circumscribed, and the engagement is an unconventional war against terrorists, not a conventional war against an identifiable nation state. But surely we would not conclude that that journalist or tourist (who could be expected to readily admit to his seizure in the foreign combat zone) had received meaningful judicial review of his claim that he was not an enemy combatant, if that claim received no judicial scrutiny at all merely because he stipulated that he was seized in that foreign combat zone. It is undoubtedly for these reasons that the Executive neither designated Hamdi an enemy combatant on the basis of his mere seizure in a foreign combat zone nor defends its designation in this court on such basis.

But as the panel disowned its promise to the detainee to provide him meaningful judicial review, so also did it disown its promise to the Executive to accord him the substantial deference to which he is constitutionally entitled for his wartime decisions as to who constitute enemies of the United States. The panel promised the Executive that the Judiciary would not sit in full review of his judgments as to who is an enemy combatant of the United States, but it adopted a rule that will henceforth do just that, cast the Judiciary as ultimate arbiter, in each and every instance, of whether the Executive has properly so classified a detainee.

Upon a moment's reflection, it is apparent that the rule of law that was fashioned by the panel professedly in the name of deference to the Executive, and that now binds us, is, in application, a rule of no deference at all. For counsel must now be provided and judicial review had of the Executive's determination that one is an enemy combatant in every instance in which the petitioner but refrains from affirmative concession that he was seized in a foreign combat zone. The Executive's undeniably important interests in the prohibition of access to detained enemy combatants for reasons of national security and in the conduct of war free from fear that it will be summoned to court to answer to the Judiciary for its enemy designations, thus, are

uncomfortably protected by little more than the hope (vain after the court's opinion, if not before) that the habeas petitioner will gratuitously or foolishly concede that his seizure occurred in a foreign zone of combat.

That the government's victory is but thinly guised defeat could not be better confirmed than by the arguments that have already been made in opposition to, and in support of, the panel's opinion by the parties to this dispute. Thus, those appearing on behalf of Hamdi argue, to no surprise and in compelling understatement, that the panel fundamentally erred for the reason that, "it cannot fairly be stated that it is 'undisputed' that Hamdi was captured within a zone of active combat operations in a foreign country" "[b]ecause Hamdi was denied the opportunity to meet with counsel, and was refused the opportunity to dispute the facts put forth by [the government] — including assertions as to where he was captured and what the circumstances were at the time." Appellee's Petition for Rehearing and Suggestion for Rehearing in Banc, at 12-13. The obvious remedy for this error being, they reasonably claim, a remand for further factual development on the issue, with allowance for participation by Hamdi himself.

And the government, as expected, rejoins that "the type of evidentiary proceeding that appellees seek would raise precisely the same problems concerning judicial oversight of military operations overseas that the panel properly concluded is not only unwise, but unauthorized under our constitutional scheme." Answer for Respondents-Appellants to Petition for Rehearing and Suggestion for Rehearing en Banc, at 11.

A more Pyrrhic victory would be hard to conceive.

In sum, then, because of its unwillingness to confront head-on the admittedly difficult issue presented by this appeal, decide upon the standard of review required by the Constitution, and resolve the case by application of that standard to the facts proffered in justification for the Executive's designation of Hamdi as an enemy combatant of the United States, the panel succeeded in securing *neither* the guarantees of the Bill of Rights nor the powers committed to the Executive by Article II of the Constitution.

B.

These breaches perhaps could be excused if the panel had divined an unassailable narrower ground for decision than that foreshadowed by either of its bold promises. However, its decision cannot be excused on this basis, because the ground upon which the panel rested its decision is anything but unassailable. *For it simply is not "undisputed" that Hamdi was seized in a foreign combat zone.*

For its repeated assertions that this circumstance is conceded, *see Hamdi* v. *Rumsfeld*, 316 F.3d 450, 459, 461, 465, 473, 475, 476 (4th Cir. 2003) ("*Hamdi III*"), the panel relied solely on the petition filed by Hamdi's father as next friend. *See id.* at 460; *id.* at 461 (stating that the Mobbs affidavit "confirms the material factual allegations in Hamdi's petition"); *id.* at 474 ("Hamdi's petition places him squarely within the zone of active combat and assures that he is indeed being held in accordance with the Constitution. . . ."). As the panel wrote,

> [i]n this case, there are two allegations that are crucial to our analysis. *First, Hamdi's petition alleges that he was a resident of and seized in Afghanistan . . . .* Second, the Government's response asserts that Hamdi is being detained pursuant to the Commander-in-Chief's Article II war powers and that the circumstances underlying Hamdi's detentions, as reflected primarily in the Mobbs declaration, establish that Hamdi's detention is lawful.

*Id.* at 471 (emphasis added). Thus, the panel opinion quite clearly rests on the petition alone for the court's conclusion that seizure in a combat zone was "undisputed."

But the next friend petition says no such thing as the panel held that it does. It states that, "[w]hen seized by the United States Government, Mr. Hamdi *resided* in Afghanistan." J.A. 9 (emphasis added). Of course, it is a *non sequitur* to conclude from the representation that Hamdi *resided* in Afghanistan at the time of his seizure, that he was also *seized* in a foreign zone of active combat. In the end, it is obvious that the panel simply missed the critical import of this distinction between residency on one hand, and seizure or capture on the other, even though it recognized — at least in passing — the distinction

between the two. As it said, though incorrectly as to the latter, "Hamdi's petition alleges that he was a resident of *and* seized in Afghanistan. . . ." *Hamdi III*, 316 F.3d at 471 (emphasis added).

Insistence that the distinction be drawn between acknowledgment of residency and concession of seizure in a combat zone is not to be clever. I have no reason to believe that Hamdi was not in a combat zone at the time of his seizure, and, to the extent relevant, I believe that he was. But, as a court of law, we cannot impute a concession of this circumstance of seizure from an innocuous acknowledgment of residency in a country in which combat was underway. Such is not credible.

No more so can other statements that appear in the next friend petition and relied upon by the panel be fairly taken as concession that Hamdi was actually seized in a foreign combat zone, as opposed to acknowledgment merely that he was a resident of a country in which there was ongoing combat at the time of seizure. The panel recites that,

> [a]ccording to the petition, "[i]n the course of the military campaign, and as part of their effort to overthrow the Taliban, the United States provided military assistance to the Northern Alliance, a loosely-knit coalition of military groups opposed to the Taliban Government," and thereby "obtained access to individuals held by various factions of the Northern Alliance."

*Hamdi III*, 316 F.3d at 460. The panel apparently viewed the quoted petition passages similarly as conceding seizure in a foreign combat zone. But a careful reading of these passages reveals that neither is such a concession fairly inferable from them. Most obviously, neither passage says anything at all about *Hamdi*. But, additionally, even if they had, there is no reason to presume that every person who was held by the Northern Alliance (assuming, for the moment, that Hamdi falls within that class) was captured in Afghanistan during the course of combat operations. Of course, this may have been the case. But it also may not have been.

The final statement in the next friend petition that the panel quoted, and on which it seemingly relied, was at once materially abbreviated

by the panel and materially supplemented. The materiality of both the omission and the addition is apparent when the actual quotation from the petition is read side-by-side with the panel's altered and para-phrased rendition of that quotation. The petition actually reads as follows:

> On information and belief, Mr. Hamdi was captured or transferred into the custody of the United States in the Fall of 2001.

J.A. 10. In its opinion, however, the panel relates the statement in this way:

> The petition further alleges that "Hamdi was captured or transferred into the custody of the United States in the Fall of 2001" *in Afghanistan.* . . .

*Hamdi III*, 316 F.3d at 460 (emphasis added). Thus, terribly signifi-cantly given that the panel's opinion rests on the "undisputed" nature of the circumstance, the panel supplies a geographical location of sei-zure and detention that the statement in the petition just does not con-tain, imputing a representation as to this location to the next friend. And though it should not be necessary to put a finer point on it than this, even had the petition statement actually contained the geographi-cal location of seizure and detention that the panel thought, the state-ment would not support the conclusion that the situs of seizure was conceded. For, even with this significant alteration, the statement would only admit that Hamdi was *either* "captured *or* transferred into custody," not necessarily one as opposed to the other.

In fact, upon reading the petition, it is actually apparent that it scru-pulously avoids any admission as to the precise geographical point of seizure, likely because such was unknown to Hamdi's father, who filed the petition. *See* J.A. 11 (Petition: "On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantanamo Bay, Cuba. . . . On or about January 11, 2002, the pre-cise date unknown to Petitioners but known to Respondents, the United States military transferred Yaser Esam Hamdi to Camp X-Ray, Guantanamo Bay, where he was held until April 2002.").

Because the panel opinion relies *exclusively* upon the next friend petition for its conclusion that Hamdi was conceded to have been seized in a foreign combat zone, and because none of the statements in that petition either concede or can be fairly read to concede seizure in such a location, the panel's opinion, which in turn rests exclusively upon such a concession, is unconvincing.

C.

Sensing the vulnerability of the panel's opinion, the concurrences in the denial of rehearing *en banc* (Judges Wilkinson and Traxler) attempt to save the panel opinion by marshaling for the first time today additional support, beyond that relied upon by the panel, for the panel's conclusion that it has been conceded that Hamdi was seized in a foreign combat zone. Thus, for example, Judge Wilkinson maintains, "Hamdi's own *filings* make clear that he was seized in a zone of active combat operations," *ante* at 17 (emphasis added), by which he makes reference not only to the next friend petition upon which the panel solely relied, *see*, *e.g.*, *Hamdi III*, 316 F.3d at 460; *id.* at 461 (stating that the Mobbs Declaration "confirms the material factual allegations in Hamdi's petition"); *id.* at 471 ("Hamdi's petition alleges that he was a resident of and seized in Afghanistan. . . ."); *id.* at 474 ("Hamdi's petition places him squarely within the zone of active combat. . . ."), but also to the new materials cited by the government in its response to the petition for rehearing, in support of the court's conclusion that the location of seizure has been conceded. In particular, excepting a letter that is admittedly "outside the legal arena" and thus obviously irrelevant, Judge Wilkinson cites to Petitioner's Traverse and Response to Respondent's Motion to Dismiss filed in the district court and a statement by the district court. *Ante* at 17.

I have previously expressed my concern about the trend in our court to attempt "to add to, subtract from, or recharacterize the facts recited and relied upon in a challenged panel opinion, or even to fine-tune, if not fundamentally reshape, the legal analysis undertaken by the original panel, *in the course of opinions respecting the denial of rehearing en banc*." *Jones* v. *Buchanan*, 325 F.3d 520, 538-40 (4th Cir. 2003) (Luttig, J., dissenting) (citing cases). Without repeating in full the reasons for this concern here, such attempted modifications are unfair to the litigants, because the parties (and the public) are

bound by the panel opinion as it was written and issued, and they may obtain further review only of the issued panel opinion, without regard to modifications suggested by a concurrence in denial of *en banc* rehearing. In other words, they are bound by the only opinion of law in the case, not by the hypothetical opinion represented by the combination of the original panel opinion and purported modifications made during proceedings appealing for *en banc* reconsideration. This is not to say that explanatory concurrences in denials of rehearing *en banc* should never be written by the author of the challenged opinion or by judges who joined in that opinion; it is only to say that when such an opinion would add significant factual or legal support for the judgment reached, the appropriate course is for the panel to modify its opinion formally so as to supply the important new facts or reasoning in an opinion that then becomes the precedent for the court which may be appealed by the parties to the Supreme Court of the United States.

But putting this concern to one side, the very fact that the concurrences have felt need to offer up the additional support that they have is confirmation that the panel at least now senses the analytical softness of its opinion. There would otherwise be no reason to attempt to shore up that opinion with these additional materials, which the panel fully considered originally and rejected as not providing any support for its conclusion that the location of seizure was "undisputed."

In any event, apart from their irrelevancy now as a matter of law given that they were not relied upon in the panel opinion, these additional materials, as the panel originally concluded, do not any more prove an affirmative concession that Hamdi was captured in a foreign combat zone, than do the statements contained in the petition filed by the next friend — even if, in combination with that sole filing relied upon by the panel, they render the case slightly closer.

Judge Wilkinson quotes from a traverse filed in the district court which reads that the petitioner's claim does not "implicate Respondents' initial detention of Petitioner Hamdi in Afghanistan." J.A. 64. Much like the acknowledgment of Hamdi's place of residence, the observation that Hamdi's claim does not implicate his initial *detention* does not, and certainly should not in a court, say anything about where he was originally *seized* — at least not necessarily. As does the

law, these parties themselves distinguish between seizure and deten-
tion throughout their submissions. If there were any doubt as to the
inappropriateness of drawing such an irrebuttable inference as to
place of seizure from place of detention in this instance, it should be
put to rest by the fact that that very same traverse filing states that
"[p]etitioner in no way concedes that Respondents' factual assertions
are true." J.A. 65 n.1. Indeed, it even specifically states that "informa-
tion about Petitioner Hamdi prior to his transfer to the custody of [the
government] is based on the hearsay of unknown members of the
Northern Alliance." *Id.* The other materials with which the concur-
rences now attempts to support the panel's opinion suffer from the
same flaw, as they too speak only as to the place of detention, not the
place of seizure.

Thus, neither the panel nor even the concurrences after the fact,
adduce a single statement from Hamdi's petition or any other filing
in this case in which there appears a concession that Hamdi was cap-
tured or seized in a foreign zone of active combat operations. A single
example suffices to show the extent of the reach attempted by the
panel. The concurrences now cite even to a defense counsel's single
word of agreement with a statement made by the district court that
Hamdi was "in a fighting situation." *Ante* at 17-18 n.2 (citing Tr. of
Aug. 13, 2002 district court proceedings). Not only is this single word
of agreement with this statement made by the district court ambiguous
on its face, it is followed by defense counsel's statement — omitted
by the concurrences — that "what is the problem with all of that, of
course, is that we have absolutely no detail with regard to the circum-
stances under which he was initially captured. . . . We don't know
what happened." J.A. 394.

### D.

But more important than the substantive content of any of these
several oblique references marshaled by the concurrences in *en banc*
denial is their source. These statements, however they are interpreted,
are not from Hamdi or from counsel acting on his behalf. They are
from Hamdi's father, acting as next friend, who, it has been repre-
sented to us, has not even had any contact with his son since the latter
was seized over a year ago. As Judge Motz recognizes, even an unam-
biguous concession as to the location of Hamdi's seizure in such a

third party submission cannot, as a legal matter, bind Hamdi to a fact that in turn is deemed dispositive of his claim for freedom.

In no sense, then, is the place of Hamdi's seizure "undisputed" by the parties to this suit. An opinion that rests exclusively on the premise of a stipulated agreement as to this circumstance of seizure, as does the panel's, is simply unconvincing. And it is rendered no more convincing, even if it is thought more palatable, by the fact that resting decision on this ground permits superficial distinguishment on fact (though not in principle) of the case in which a citizen seized on American soil is denominated an enemy combatant, *see Hamdi III*, 316 F.3d at 465 (citing and distinguishing *Padilla* v. *Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002)), which case the panel feared might unavoidably be reached by a decision on the issue as presented and under the facts as proffered.

### E.

Judge Traxler writes extensively in defense of the panel opinion, although, beyond embracing the materials newly cited by Judge Wilkinson, he does little more than repeat at length the panel's reasoning (where needed, embroidering upon that opinion for himself), and quote liberally from this and Judge Motz's opinion. But the juxtaposition of the particular defenses that he chooses to make, with their obvious responses, all but confirms to the careful reader the shortcomings in the panel's opinion. It is undoubtedly for this reason that Judge Traxler's co-panelists, who, with him, jointly authored the original opinion, do not align themselves with him today.

### 1.

To begin with the most significant, Judge Traxler, though writing to bolster the panel's conclusion that the place of seizure in a foreign combat zone was in fact conceded in the next friend petition, actually ends up admitting that the petition itself does *not* explicitly concede seizure in such a zone. *See*, *e.g.*, *ante* at 23-24 ("Judge Luttig correctly observes that the habeas petition does not *explicitly* state that 'Hamdi was captured in a zone of active combat in a foreign theater of conflict.'"); *id*. at 23 (stating that "the petition[ ] fail[s] to affirmatively state that Hamdi was captured in a foreign combat zone"). This

is an admission of no small consequence, of course, for the panel relied entirely upon the existence of such a concession of capture in a foreign combat zone in the petition, and the opinion plainly regarded this concession as having been made explicitly and unequivocally. Certainly, until today, the reader would have never thought otherwise. Nowhere, for instance, is there even the slightest suggestion that the panel regarded this dispositive concession as merely "implicit." And there certainly is no mention of any inferential steps of which one would expect explanation before a dispositive concession is implied by a court.

By this candid admission alone, Judge Traxler has made out the case against the panel's opinion better than have either Judge Motz or myself. For if, as Judge Traxler says, this is a "momentous" case, then he has now confirmed that it was dismissed on the basis of a concession believed by the panel (though disputed by the parties) to have been made only "implicitly," and at that, by a third party to the action who not only had had no contact whatsoever with the petitioner himself, but who even disavowed that he could speak to the facts except upon information and belief.

Unwittingly compounding further the analytical problems that beset the panel's opinion as it is written, Judge Traxler next attempts to marshal for the first time support for what was the panel's assumed, but wholly unsupported, holding that a next friend may concede facts sufficient to conclude a litigation when the detainee is inaccessible to the next friend by reason of the respondent's own actions. All that need be said as to this effort is that, after now critically addressing himself as a single judge to the proposition that the panel originally uncritically assumed, Judge Traxler is able to cite only a single case and that of a district court almost forty years ago. *See ante* at 29 (citing *Hall* v. *Hague*, 34 F.R.D. 449 (D. Md. 1964)). *And not even that case holds that a next friend may concede the facts that will lead to the dismissal of the plaintiff's suit in circumstances anywhere approaching those presented by this case.* Thus, on this score as well, has Judge Traxler made the case for dissent better than have either Judge Motz or myself.

Judge Wilkinson, to his credit, recognizes as much, and attempts to salvage the panel opinion on this critical point by asserting that "or-

dinary civil [and] criminal litigants" *cannot* be bound by next friend concessions, but that Hamdi *must be so bound*, for the reason that he allegedly was seized in a foreign zone of active combat operations. *See ante* at 17-18 n.2. But in attempting the salvage, Judge Wilkinson himself comes very close (although he does not realize it) to outright conceding the indefensibility of the point, because the binding character of a next friend concession obviously does not turn upon whether the concession is or is not made on behalf of an individual allegedly seized abroad, or even an individual seized abroad in a foreign theater of battle. Nor does the separation of powers have anything to do with this necessary legal fact. And even if the binding character of a next friend concession somehow did turn upon the location of the petitioner's seizure, the principle would cut in precisely the opposite direction from that believed by Judge Wilkinson: the alleged concession might be binding upon one seized domestically with whom the next friend is in unfettered contact, but presumptively would never be binding upon one seized abroad and held incommunicado.

In tacit recognition that these belated arguments as to the fact of concession and the legal acceptability of third-party fact concessions ring hollow, Judge Traxler (notably speaking only for himself) suggests finally that the panel would have reached the same outcome in this case even had it not concluded that the place of seizure was undisputed. *See ante* at 37 ("Nor for that matter, did we even hold that the Mobbs Declaration would have been insufficient had the place of capture been in dispute in this case."). I do not know quite how to respond to this statement, because I am in no position to say that, irrespective of what the panel wrote, it would not have decided the case differently had it concluded that the location of seizure was disputed. All that I, the parties, and the public can do is reason inferentially from the opinion for the court, which the panel did write. And based upon that opinion, while Judge Traxler may now in hindsight characterize the supposed concession by Hamdi's next friend as insignificant, the panel opinion he co-authored treats it as anything but. The opinion well speaks for itself in rebuttal to this suggestion. Said the panel, in emphasized words that Judge Traxler would have us overlook today, the concession of seizure in a combat zone made in the petition is "crucial to our analysis." *Hamdi III*, 316 F.3d at 471.

Thus, while Judge Traxler may now want to say that the panel would decide the case no differently absent a concession, he is faced

with self-contradiction to so maintain, given that the opinion he co-authored went out of its way to denominate as "crucial" to its analysis the concession that it mistakenly believed was made. The unavoidable inference to be drawn from such a characterization of fact disposi-tively relied upon is not, as Judge Traxler would now have it, that absent that fact, the disposition would still be the same, but rather, that the disposition reached on the strength of that fact quite likely would be different if the fact were otherwise.

2.

Unable to shore up the foundation of the panel's opinion, that Hamdi's next friend conceded that Hamdi was seized in a zone of active combat operations and bound Hamdi to that fact, Judge Traxler attempts to shift the focus away from the panel's opinion and the ulti-mate legal issue entirely, by erecting and then attacking a series of straw man arguments he ascribes to this dissent. Thus, he suggests that I argue that the facts alleged in the petition should be taken as false, *ante* at 27-28, and that I am "attempt[ing] to rewrite the case history and the substance of the habeas claim," *ante* at 28. Of course, I make no such arguments. I make the simple point that the petition does not affirmatively concede capture in a foreign combat zone, a fact that Judge Traxler now admits, *see ante* at 23.

Judge Traxler next argues that I have unfairly stated that neither party has attempted to defend the significance of the place of capture, *ante* at 37-38. Again, I make no such statement. What I have stated is that neither party assigned any legal significance to the argument relied on by the panel that the locus of capture was "undisputed." (And, given the record as I have recited it herein, it is unsurprising that they did not.) But to remove the source of my objection from all doubt, and as I explain more fully below, it is *not* the panel's reliance on the place of capture that troubles me. Rather, it is the panel's inde-fensible reliance on an assumed concession by the petitioner, as opposed to a proffer by the government, to establish this "fact."

In his final attempt to shift the focus to a criticism that I have not made, but to which response is easier, Judge Traxler asserts that I am criticizing the panel for issuing a narrow, as opposed to a broad, hold-ing. *See ante* at 37. As I have quite clearly said, however, the panel's

error in my view was not in its search for a narrower ground, but rather in the unpersuasiveness of the putatively narrower ground on which it ultimately relied — a concession by Hamdi as to the place of his seizure. Not only is this narrower ground of concession factually unpersuasive, it is also unpersuasive as a matter of law, for the reasons Judge Motz and I have set forth.

3.

When all is said and done, then, Judge Traxler's writing today both confirms the vulnerabilities inherent in the panel's opinion he seeks to defend and puts the lie to the panel's assertion that, by grounding its decision on the reputed concession by Hamdi's next friend, it *both* provided Hamdi meaningful judicial review *and* protected the President's Article II powers to determine who and who are not enemies of the United States.

As to the former, not only does he admit that there is no such explicit concession as the panel believed, but he is forced as well to acknowledge that there is not even legal support for the panel's unexamined supposition that a next friend can actually concede a dispositive fact without even the petitioner's knowledge. As to the latter, his analytical admissions betray well that Hamdi was not provided the meaningful judicial review that he was promised. And, through his attempt to discount the importance of the supposed concession to the panel's disposition, he only draws attention to the pivotal importance of that supposed concession and thereby to the trifling deference the panel accorded the President of the United States in his determinations of who constitute enemies of our Country. A more forceful explanation of the grounds for dissent I could not make.

II.

Because of the overarching importance of the opinion of law that resolves the issue presented by this appeal, because of the panel opinion's dismissiveness of the substantial interests at stake in this case for both citizen and government, and because of the analytical vulnerability of the court's opinion as it stands, I believe that both the United States and the petitioner would be served by reconsideration by our full court.

Upon reconsideration, we should decide the critical issue of the appropriate standard that is to govern the Judiciary's review of an individual's challenge to an Executive designation of enemy combatant status, the indecision of which by the panel I believe fails to serve the substantial interests of not only the parties but also the public in the resolution of this issue. Having decided the governing standard, we should decide the issue of whether that standard has been satisfied in this case by the government's proffer of the facts contained in the Michael H. Mobbs affidavit, the like indecision of which by the panel also, I believe, fails to serve the parties and the public.

### III.

Although I reserve ultimate judgment because of the difficulty of the issue and because I write in dissent from the request to rehear the case and therefore without the benefit of argument, I believe, as to the standard of review, that the government may be correct that

> [p]roper respect for separation of powers and the limited role and capabilities of courts in matters of national security may well limit the courts to the consideration of legal attacks on detention of the type considered in [*Ex parte*] *Quirin*[, 317 U.S. 1 (1942)] and [*In re*] *Territo*, [156 F.2d 142 (9th Cir. 1946),] and raised by the petition in this case. At most, however[ ] . . . a court's proper role in a habeas proceeding such as this would be to confirm that there is a factual basis supporting the military's determination that a detainee is indeed an enemy combatant.

Br. of Respondents-Appellants at 28 (internal citation omitted); *see also id.* at 36 ("[T]o prevail under a constitutionally appropriate standard, the government would at most need to provide some factual basis for supporting the military's determination that Hamdi is an enemy combatant."). That is, I believe that the President of the United States may well be entitled under the Constitution to receive from the Judiciary the deference afforded by a standard selected from those along this continuum, when, in exercise of the powers conferred upon him by Article II of the Constitution, he designates a person as an enemy combatant against this Nation.

As to the application of the standard to the facts proffered by the government in support of the Executive's designation of Hamdi as an enemy combatant, I reserve ultimate judgment for the same reasons. I am prepared to say, however, that I would likely conclude, as argued by the United States, that the facts recited in Special Advisor Mobbs' affidavit, as to which there is not even hint of fabrication, are sufficient to satisfy the constitutionally appropriate standard for the President's designation of an enemy of the United States.

This affidavit states that Hamdi traveled to Afghanistan in the summer of 2001, where he promptly affiliated with a Taliban military unit and received weapons training. It further states that during a battle between the Taliban and the Northern Alliance later that year, Hamdi's Taliban unit surrendered to Northern Alliance forces. It continues that Hamdi was directed to surrender his Kalishnikov assault rifle (*i.e.*, AK-47) to Northern Alliance forces and was subsequently imprisoned. The affidavit represents that, while in prison, Hamdi was determined by the United States military screening team to meet the criteria for enemy combatants over whom the United States was taking control. And finally, the affidavit relates that in January 2002, a Detainee Review and Screening Team established by the Commander of the United States Central Command reviewed Hamdi's record and determined again that he met the criteria established by the Secretary of Defense for individuals over whom United States forces should take control and transfer to Guantanamo Bay.

In addition to these declarations made under penalty of perjury by the appointed representative of the government, the President of the United States, through his Solicitor General, has represented to this court that in his judgment Hamdi is indeed an enemy combatant, detention of whom is warranted in the interests of national security.

The panel's contrary holding notwithstanding, I suspect that more than this would be unnecessary to affirm the President's decision to designate Hamdi an enemy of the United States.

In all events, I believe that it is the obligation of this court to decide these issues that have been presented to us by the United States and by one of its citizens. At times, judicial avoidance of the difficult and

the politically charged is the more prudent and the more faithful to the judicial role, both. This is a case in which it is neither.

**********

For the reasons set forth, I would grant the suggestion for rehearing *en banc*. Accordingly, I respectfully dissent from the court's denial of that suggestion.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting from denial of rehearing en banc:

For more than a year, a United States citizen, Yaser Esam Hamdi, has been labeled an enemy combatant and held in solitary confinement in a Norfolk, Virginia naval brig. He has not been charged with a crime, let alone convicted of one. The Executive will not state when, if ever, he will be released. Nor has the Executive allowed Hamdi to appear in court, consult with counsel, or communicate in any way with the outside world.

Precedent dictates that we must tolerate some abrogation of constitutional rights if Hamdi is, in fact, an enemy combatant. However, a panel of this court has held that a short hearsay declaration by Mr. Michael Mobbs — an unelected, otherwise unknown, government "advisor," — "standing alone" (subject to no challenge by Hamdi or court-ordered verification) is "sufficient as a matter of law to allow meaningful judicial review" and approval of the Executive's designation of Hamdi as an enemy combatant. *See Hamdi v. Rumsfeld*, 316 F.3d 450 (4th Cir. 2003). I cannot agree.

To justify forfeiture of a citizen's constitutional rights, the Executive must establish enemy combatant status with more than hearsay. In holding to the contrary, the panel allows appropriate deference to the Executive's authority in matters of war to eradicate the Judiciary's own Constitutional role: protection of the individual freedoms guaranteed all citizens. With respect, I believe the panel has seriously erred, and I dissent from the court's refusal to rehear this case *en banc*.

I.

The panel's decision marks the first time in our history that a federal court has approved the elimination of protections afforded a citi-

zen by the Constitution solely on the basis of the Executive's designation of that citizen as an enemy combatant, without testing the accuracy of the designation. Neither the Constitution nor controlling precedent sanction this holding.

The rights provided in the Constitution to each American citizen include the right to due process of law and to petition for a writ of habeas corpus. U.S. Const. amend. V; art. I, § 9. Unquestionably, the availability of habeas relief extends to detention pursuant to the Executive's military authority. *See, e.g.*, *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866); *Duncan v. Kahanamoku*, 327 U.S. 304 (1946). Just as clearly, the responsibility for ensuring that individuals detained by the Executive receive the due process guarantees of the Constitution, including the right to petition for habeas corpus, rests with the courts. *See In re Yamashita*, 327 U.S. 1, 9 (1946). As the Supreme Court has explained, "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions," *Sterling v. Constantin*, 287 U.S. 378, 401 (1932); *see Duncan*, 327 U.S. at 322-23; and the "government must always be accountable to the judiciary for a man's imprisonment." *Fay v. Noia*, 372 U.S. 391, 402 (1963), *overruled on other grounds*, *Coleman v. Thompson*, 501 U.S. 722 (1991).

The panel acknowledges as much, conceding that "[t]he duty of the judicial branch to protect our individual freedoms does not simply cease whenever our military forces are committed by the political branches to armed conflict" and that "detention of United States citizens must be subject to judicial review." *Hamdi*, 316 F.3d at 464. Further, the panel recognizes that Hamdi, "an American citizen currently detained on American soil," is entitled to petition for a writ of habeas corpus and that habeas proceedings "naturally contemplate[ ] the prospect of factual development." *Id.* at 470, 473. The panel even recognizes the inadequacy of the sole "evidence" the Executive has proffered to support its enemy combatant designation of Hamdi — the Mobbs declaration — for it admits that "a capable attorney could challenge the hearsay nature of the Mobbs declaration and probe each and every paragraph for incompleteness or inconsistency." *Id.* at 473. Yet, the panel concludes that "no . . . factual inquiry on our part is necessary or proper" and that "Hamdi is not entitled to challenge the facts presented in the Mobbs declaration." *Id.* at 473, 476.

The panel suggests that this conclusion accords with precedent. *See id.* at 475 ("this same issue arose in *Quirin* . . . the *Quirin* principle applies here"). In fact the Supreme Court has *never* held that a person designated by the Executive as an enemy combatant cannot challenge that designation or that a court cannot require the Executive to substantiate it. In the case on which the majority relies, *Ex Parte Quirin*, 317 U. S. 1 (1942), the Court did hold that for a violation of the laws of war, even an American citizen could be treated as an "enemy combatant" and held without the full array of Constitutional rights, but only because *the citizen, after consultation with legal counsel, stipulated to the facts supporting the enemy combatant designation.*

Thus, in *Quirin*, a German-born soldier, who claimed to be an American citizen, stipulated that after receiving payment by the German government and instruction by the "German High Command to destroy war industries and war facilities in the United States," he and six other German soldiers secretly landed in the United States during World War II with "a supply of explosives." *Id.* at 20-21. Only after finding that these "conceded facts" demonstrated "plainly" that the soldiers were within the "boundaries of the jurisdiction of military tribunals," did the Supreme Court reject their contention that they could not be tried by a military commission. *Id.* at 46. Critical to the case at hand, the Court first expressly rejected the Executive's argument that the soldiers, "must be denied access to the courts because they are enemy aliens who have entered our territory." *Id.* at 24-25. Instead, each of the soldiers was permitted, with the assistance of counsel, to file his *own* (not a next friend) petition for a writ of habeas corpus, which the courts reviewed to ensure that each soldier was in fact an enemy combatant. *Id.*

None of the few other Supreme Court cases addressing the rights of enemy combatants involved American citizens. But even when dealing with the claims of German and Japanese citizens detained by military authorities outside the United States during World War II, the Court has never suggested that an enemy combatant is without recourse to challenge that designation in court. On the contrary, the Court has held that a resident alien — who, the Court specifically noted, has far less status than those, like Hamdi, who enjoy the "high privilege" of citizenship — *can* challenge the Executive's designation of him as an enemy. *Johnson v. Eisentrager*, 339 U.S. 763, 770, 775

(1950) (internal quotation marks and citation omitted). As the Court explained: "*Courts will entertain his plea* for freedom from Executive custody only *to ascertain* the existence of a state of war and *whether he is an alien enemy*." *Id.* at 775 (emphasis added); *see also id.* at 784-85; *Ludecke v. Watkins*, 335 U.S. 160, 171 n.17 (1948) (noting that "whether the person restrained is in fact an alien enemy . . . may also be reviewed by the courts"); *Yamashita*, 327 U.S. at 8 (noting that "[t]he courts may inquire whether the detention complained of is within the authority of those detaining the petitioner" and "the Executive branch of the government could not, unless there was a suspension of the writ, withdraw from the courts the duty and power" to inquire whether the "Constitution or laws of the United States withhold authority" from a military tribunal).

Moreover, the Supreme Court has upheld the Executive's designation of a person as an enemy alien or enemy combatant only when presented with *facts* supporting this designation — facts stipulated by the petitioner with the advice of counsel, as in *Quirin*, or facts proved by the prosecution at a military trial in which the petitioner was afforded counsel, as in *Yamashita*. In the case at hand, no facts have been presented to support the Executive's designation. The Executive has not permitted Hamdi to consult with counsel or challenge the allegations contained in the Mobbs declaration. And Hamdi has certainly not stipulated to anything. Denied the most basic procedural protections, Hamdi could not possibly mount a challenge to the Executive's designation of him as an enemy combatant. Yet in *Eisentrager*, *Ludecke*, and *Yamashita* the Supreme Court has explained that even aliens are entitled to precisely this right. Thus, far from supporting the panel's position, controlling precedent prohibits its approach.

## II.

Without any acknowledgment of its break with precedent, the panel embarks on a perilous new course — approving the Executive's designation of enemy combatant status not on the basis of facts stipulated or proven, but solely on the basis of an unknown Executive advisor's declaration, which the panel itself concedes is subject to challenge as "incomplete[ ]" and "inconsisten[t]" hearsay. *Hamdi*, 316 F.3d at 473. My good colleagues' opinion, although well-intentioned and replete with compelling declarations of separation-of-powers principles with

which no one would quarrel, utterly fails to set forth an adequate rationale for its breathtaking holding.

Indeed, the panel offers only a single justification for its unprecedented decision to permit the Executive to support its designation of Hamdi as an enemy combatant with pure hearsay: Hamdi's capture in a "zone of active combat" was assertedly "undisputed." *See Hamdi*, 316 F.3d at 459 ("*Because it is undisputed* that Hamdi was captured in a zone of active combat in a foreign theater of conflict, we hold the submitted declaration is . . . sufficient." (emphasis added)); *id.* at 476 ("Hamdi is not entitled to challenge the facts presented in the Mobbs declaration," because he "has been designated an enemy combatant and *it is undisputed* that he was captured in a zone of active combat operations abroad." (emphasis added)). According to the panel, this apparently all-important fact is "undisputed" because "Hamdi's petition places him squarely within the zone of active combat." *Id.* at 474; *see also id.* at 460-61.

This is a thin reed on which to rest abrogation of constitutional rights, and one that collapses entirely upon examination. For Hamdi has never been given the opportunity to dispute any facts. The "facts" as to the place of Hamdi's "capture" could only be "undisputed" by reliance on a facially innocuous statement in a petition filed by Hamdi's father, as his "next friend." Thus, the panel determines that a petition filed by a next friend on behalf of, but without access to or consultation with, the petitioner constitutes a binding admission by the petitioner that results in the forfeiture of the petitioner's constitutional rights. This holding flatly contravenes venerable Supreme Court precedent. The Court long ago held that "a next friend or guardian *ad litem* cannot, by admissions or stipulations, surrender the rights of" the represented party. *Kingsbury v. Buckner*, 134 U.S. 650, 680 (1890); *see also White v. Miller*, 158 U.S. 128, 146 (1895) (same); *Stolte v. Larkin*, 110 F.2d 226, 233 (8th Cir. 1940) (collecting cases).[1]

---

[1]Judge Wilkinson contends in his concurrence to the order denying rehearing *en banc* that these cases do not apply to Hamdi because he is an enemy combatant who is not entitled to rights "enjoyed by ordinary civil or criminal litigants." *See ante* at 17-18 n.2. This reasoning is dizzyingly circular. The panel relied heavily on an admission of Hamdi's next

Just as importantly, even if the statement in his father's petition that "[w]hen seized," Hamdi "resided in Afghanistan," J.A. 9, some-

friend (who had no opportunity to consult with Hamdi) to find Hamdi an enemy combatant. Now, Judge Wilkinson maintains that *because* Hamdi is an enemy combatant, *White* and *Kingsbury* do not apply, and Hamdi is bound by his next friend's assertedly critical admission. *Id.* Thus, Judge Wilkinson seeks to use the panel's conclusion (that Hamdi is an enemy combatant) to justify the panel's improper reliance on an admission of Hamdi's next friend, which provides the very basis for that conclusion. In sum, according to Judge Wilkinson, because Hamdi's next friend made a purportedly devastating admission, Hamdi forfeits all rights to challenge that admission, and ultimately all constitutional rights. Surely this does not constitute the "meaningful judicial review" that the panel promised. *See Hamdi*, 316 F.3d at 462, 473.

Nor does the district court opinion, *Hall v. Hague*, 34 F.R.D. 449 (D. Md. 1964), relied on by Judge Traxler in his concurrence, *ante* at 29, offer support for the panel's startling approach. In *Hall*, a district judge merely determined that the guardian *ad litem* of a minor could admit certain housekeeping matters prior to trial, on the understanding that "*[a]t the trial*, the judge will be able to tell if any unjustified admissions have been made and take appropriate action." *Id.* at 449-50 (internal quotation marks and citation omitted) (emphasis added). This is a long way from holding, as the panel does (ignoring *Kingsbury* and *White*), that a statement in a petition filed by Hamdi's next friend constitutes an admission by Hamdi providing the basis for denial of his constitutional rights and indefinite imprisonment, *without the benefit of any trial*. Indeed, Judge Traxler's assertion that "there is no reason to believe that [Hamdi's] rights are being bargained away or that a factual mistake is being made," in the next friend petition, *ante* at 29 n.7, ignores the obvious. How could there be any "reason to believe that rights are being bargained away or that a factual mistake is being made" when the only person who could offer such a reason or contest a factual mistake — Yaser Esam Hamdi — has never been given the chance to do so? By keeping Hamdi imprisoned incommunicado, the Executive has denied him this opportunity. Thus, we simply have no idea whether his "rights are being bargained away" or "a factual mistake is being made." It is precisely to avoid resolving an individual's fate on such uncertain grounds that the Supreme Court has held that a next friend petition "cannot be excepted to for insufficiency, nor can any admission . . . be binding." *White*, 158 U.S. at 146.

how translated into Hamdi's admission that he was captured "in a zone of active combat," *Hamdi*, 316 F.3d at 459, this should not render the Executive's designation of enemy combatant status irrebuttable. The ramifications of such a holding are chilling. Pursuant to the panel's decision, for example, any of the "embedded" American journalists covering the war in Iraq or any member of a humanitarian organization working in Afghanistan,[2] could be imprisoned indefinitely without being charged with a crime or provided access to counsel if the Executive designated that person an "enemy combatant." Indeed, under the panel's holding, any American citizen seized in a part of the world where American troops are present — *e.g.*, the former Yugoslavia, the Philippines, or Korea — could be imprisoned indefinitely without being charged with a crime or afforded legal counsel, if the Executive asserted that the area was a zone of active combat.[3] Thus, the only basis for relying on a hearsay declaration to approve the Executive's designation of Hamdi as an enemy combatant, *i.e.*, Hamdi's assertedly "undisputed capture[ ] in a zone of active combat," is in truth a chimera and certainly provides no justification for the panel's extraordinary holding.

---

[2]I note that in a letter to Senator Patrick Leahy, contained in the record, but ignored by the panel, Hamdi's father, in fact, states that his son went to Afghanistan less than two months before September 11, 2001 to do "relief work," was "trapped in Afghanistan once that military campaign began," could not have received military training, and was never an enemy combatant. J.A. 153-54.

[3]I find puzzling the contention that the panel opinion "does not speak to the issue of whether an 'enemy combatant' may challenge the government's claim that the former Yugoslavia, the Philippines, or Korea is a zone of active military operations," *ante* at 36-37. First, no basis is provided for distinguishing between the "troops . . . still on the ground in Afghanistan," *Hamdi*, 316 F.3d at 476, and American troops "on the ground" in the former Yugoslavia, the Philippines, or Korea. Moreover, in suggesting that a person detained in one of those countries might be able to challenge the Executive's designation of that country as a zone of active military operations, the concurrence necessarily implies that the question of what constitutes such a zone is justiciable — a conclusion seemingly at odds not only with the panel opinion, *see* 316 F.3d at 476 (dismissing Hamdi's contention that hostilities in Afghanistan had ended), but also with the concurrence itself. *See ante* at 32 n.9.

Nor, as the panel implicitly acknowledges, does the two-page, nine paragraph Mobbs declaration by itself, provide such justification. The panel's assessment of the Mobbs declaration is entirely accurate; that declaration could indeed be easily and successfully "challenge[d]" as "hearsay," and "probe[d]" for "incompleteness or inconsistency." *Hamdi*, 316 F.3d at 473.[4] The declaration contains no indicia of reliability except for Mr. Mobbs' oath — which seems of minimal value given that Mr. Mobbs does not claim *any* personal knowledge of the facts surrounding Hamdi's capture and incarceration. Rather Mr. Mobbs states that his "familiar[ity]" with "the facts and circumstances" surrounding Hamdi's capture, is "[b]ased upon" his review of undisclosed and unenumerated "relevant records and reports." J.A. 61. In fact, Mr. Mobbs himself did not (perhaps could not) make the determination that Hamdi is an "enemy combatant." Instead, Mr. Mobbs can merely declare that, according to "records and reports," "Hamdi was determined by the U.S. military screening team to meet the criteria for enemy combatants." J.A. 62. The Mobbs declaration does not even state what, if any, evidence this "U.S. military screening team" relied on in making that determination or whether Mr. Mobbs himself conducted any independent review of this evidence. Indeed, the declaration's statement that Northern Alliance troops initially captured Hamdi suggests that even the U.S. military does not have any first-hand knowledge of Hamdi's conduct or status in Afghanistan.

In sum, the record provides no credible evidence supporting the Executive's designation of Hamdi as an enemy combatant. Accordingly, a court has no basis upon which to perform its constitutional duty "'to examine'" the "'validity'" of the "'reason'" for Hamdi's "'commitment.'" *See Ex parte Merryman*, 17 F. Cas. 144, 150 (No. 9,847) (C.C. Md. 1861) (noting "'the absolute necessity of expressing upon every commitment the reason for which it is made, [and] that the court, upon a habeas corpus, may examine into its validity'" (quoting 3 Blackstone, Commentaries 133, 134)). Thus, although the panel steadfastly maintains that it engages in a "meaningful judicial

---

[4]The panel twice details the statements made in the Mobbs declaration, *Hamdi*, 316 F.3d at 461 and 472, and the Executive forcefully contends that the declaration meets the "some evidence" standard, but the panel carefully refrains from so holding. *Id.* at 474.

review," *see Hamdi*, 316 F.3d at 462, 473, its rubberstamp of the Executive's unsupported designation lacks both the procedural and substantive content of such review.[5]

At the same time, I hasten to note that the total inadequacy of the Executive's proffer and the panel's review here does not provide license for a searching judicial inquiry into the factual circumstances of every detainee's capture, or require compliance with a production order as demanding as that called for by the district court.[6] Such an approach could hamper the Executive's ability to wage war, as the panel explains at length. *See Hamdi*, 316 F.3d at 469-473. But the possibility, no matter how real, that an improperly conducted judicial inquiry could impair the Executive's ability to wage war cannot, as the panel seems to believe, provide a justification for holding that the Executive can indefinitely detain an American citizen (even one captured in a zone of active hostilities) without producing any credible evidence that the citizen is an "enemy combatant." The Constitution

---

[5]Moreover, while I applaud the panel's attempt to confine its holding to the facts at hand, without effect on the rights of citizens captured on American territory, *see Hamdi*, 316 F.3d at 465, similar attempts to constrain judicial holdings have proved unavailing. As Justice Jackson recounted, despite the Supreme Court's careful efforts to limit the scope of its holding in *Hirabayashi v. United States*, 320 U.S. 81 (1943), to the specific facts of that case, *see id.* at 101-02, 105, the Court later determined that *Hirabayashi* dictated the holding in *Korematsu v. United States*, 323 U.S. 214, 218 (1944). *See id.* at 247 (Jackson, J., dissenting) ("The Court is now saying that in *Hirabayashi* we did decide the very things we there said we were not deciding."). I fear that the panel may also have opened the door to the indefinite detention, without access to a lawyer or the courts, of any American citizen, even one captured on American soil, who the Executive designates an "enemy combatant," as long as the Executive asserts that the area in which the citizen was detained was an "active combat zone," and the detainee, deprived of access to courts and counsel, cannot dispute this fact.

[6]Although I agree with the panel that the district court's production order required too much, the experienced district judge should be commended nonetheless. For, during wartime and in the face of opposition by representatives of a President enjoying record popular support, the district judge has courageously attempted to provide the meaningful judicial review that the Constitution mandates, however unpopular the case.

gives Congress, not the Executive and not the courts, the power to suspend the writ of habeas corpus when the public safety requires it. U.S. Const. art. I, § 9. Absent a suspension of the writ, the Constitution demands that we strike the proper balance between ensuring the Executive's ability to wage war effectively *and* protecting the individual rights guaranteed to all American citizens. *See Yamashita*, 327 U.S. at 8. Without such a balance, our system of ordered liberty will indeed ring hollow.

Thus, in contrast to the panel's holding, which effectively transforms the asserted "fact" of being captured in a zone of active hostilities into an *irrebuttable* presumption of "enemy combatant" status,[7] a court could regard such a "fact" as creating a *rebuttable* presumption, thereby shifting the burden to Hamdi (and others like him) to establish that he was *not* an "enemy combatant." The burden of persuasion would then be on Hamdi, with the aid of counsel, to proffer affirmative evidence of his "non-combatant" status. This would seem to be the course dictated by precedent.

Alternatively, if the Executive produced the "relevant records and reports" on which Mr. Mobbs relied in making his declaration, a court might be able to assure itself of the legitimacy of the Executive's designation. (Of course, the possibility that the "relevant records" pertaining to Hamdi's detention might contain *no evidence* that he was an "enemy combatant" is precisely the reason why judicial review is necessary.) The Department of Defense has obviously already com-

---

[7]Notwithstanding Judge Traxler's contention, nineteenth and early twentieth century takings cases do not support the panel's *de facto* creation of this irrebuttable presumption to justify Hamdi's indefinite imprisonment. *Cf. ante* at 32. Those cases, upholding the wartime destruction or seizure without compensation of *property* outside the United States, including property owned by U.S. citizens, do broadly note that "[i]n war, all residents of [an] enemy country are enemies." *Lamar v. Browne*, 92 U.S. 187, 194 (1875). But *no liberty* rights of U.S. citizens were at issue in any of those cases or their progeny. *See, e.g.*, *Juragua Iron Co. v. United States*, 212 U.S. 297, 305-306 (1909); *Lamar*, 92 U.S. at 194. Indeed, the Supreme Court has never held that an American citizen becomes an "enemy" and can be deprived of his liberty rights solely by virtue of residing in an enemy country during wartime.

piled and collected these records. Producing them for judicial review, *ex parte* and *in camera* if necessary, would not in any way hamper the Executive's ability to wage war. Indeed, the Executive has apparently already made similar productions in other cases. *See Padilla v. Bush*, 233 F. Supp. 2d 564, 608 (S.D.N.Y. 2002); *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002). Such evidence might suffice to substantiate the Executive's designation.[8]

But in all events, the Executive must offer more than hearsay to support that designation; and so in answer to the question certified to us — "[w]hether the Mobbs Declaration, standing alone, is sufficient as a matter of law to allow a meaningful judicial review of Yasser Esam Hamdi's classification as an enemy combatant?" — the answer must be, "No."

### III.

In conclusion, I must note that I have no doubt that, in this time of great challenge for our Nation, the Executive has acted in good faith when designating Hamdi an enemy combatant. Under our Constitution, however, it is the responsibility of the courts to ensure that American citizens are not deprived of liberty without due process of law, regardless of the personal belief of any individual judge concerning the integrity of the Executive. As the Framers well understood, the Executive branch must be subjected to checks on its power if individual liberties are to be preserved. *See Duncan*, 327 U.S. at 322-23; *see also United States v. Robel*, 389 U.S. 258, 264 (1967).

But one need not refer back to the time of the Framers to understand that courts must be vigilant in guarding Constitutional freedoms, perhaps never more so than in time of war. We must not forget

---

[8]In *Padilla*, now certified for interlocutory appeal to the Second Circuit, the district court ruled that it would apply the "some evidence" standard suggested by the Executive, once Padilla — with the assistance of counsel — "presents any facts he may wish to present to the court" regarding his designation as an enemy combatant. *Padilla*, 233 F. Supp. 2d at 608, 610; *Padilla v. Rumsfeld*, 2003 WL 1858157 (S.D.N.Y. April 9, 2003) (granting government's motion to certify orders in case for interlocutory appeal).

the lesson of *Korematsu*, a case in which the Supreme Court sanctioned the military internment of thousands of American citizens of Japanese ancestry during World War II. *See* 323 U.S. at 219. In its deference to an Executive report that, like the Mobbs declaration, was filed by a member of the Executive associated with the military and which purported to explain the Executive's actions, the Court upheld the Executive's conviction of Korematsu for simply remaining in his home, in violation of the military internment order. *See id.* at 215-16.

Of course, history has long since rejected the *Korematsu* holding. Indeed, Congress itself has specifically repudiated *Korematsu*, recognizing that "a grave injustice was done to" those "of Japanese ancestry by th[e] actions . . . carried out without adequate security reasons and . . . motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership." 50 App. U.S.C.A. § 1989a(a) (West 1990). But in truth, here, as in *Korematsu*, the Executive has failed to proffer any real evidence to justify its action. When presented with no basis for reviewing the Executive's designation that an American citizen is an enemy combatant, other than the assurance of a Defense Department "advisor" that someone in the United States military made this determination, a court must demand more. *Cf. Korematsu*, 323 U.S. at 245 (Jackson, J., dissenting) ("So the Court, having no real evidence before it, has no choice but to accept General DeWitt's own unsworn, self-serving statement, untested by any cross-examination.").

The Executive's treatment of Hamdi threatens the freedoms we all cherish, but the panel's opinion sustaining the Executive's action constitutes an even greater and "more subtle blow to liberty." *Id.* at 245-46 (Jackson, J., dissenting). For although the incommunicado imprisonment of Hamdi will hopefully terminate some day, the panel opinion rationalizing this imprisonment will live on. As Justice Jackson warned, when the Executive "overstep[s] the bounds of constitutionality, . . . it is an incident," but when a court "review[s] and approve[s]," that passing incident becomes the doctrine." *Id.* at 246.

Courts have no higher duty than protection of the individual freedoms guaranteed by our Constitution. This is especially true in time of war, when our carefully crafted system of checks and balances must accommodate the vital needs of national security while guarding

the liberties the Constitution promises all citizens. *See id.* at 234 (Murphy, J., dissenting) ("Individuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support."). I believe that our court has failed in this case to carry out this most important responsibility. I would require a greater showing from the Executive before I would permit an American citizen, held in the United States, to be imprisoned indefinitely, without ever being afforded the opportunity to appear in court, contest the allegations against him, or consult with a lawyer.

It is for all of these reasons that I respectfully dissent from the court's denial of rehearing *en banc*.[9]

---

[9]Contrary to Judge Wilkinson's suggestion in his concurrence, I do not question that Articles I and II delegate decisions as to the conduct of war and national defense to the Executive and Legislative branches of our government, and that we owe deference to those decisions. But deference to the political branches does not compel the Judiciary to abdicate its own duty to protect the individual liberties guaranteed all citizens. My disagreement with the panel decision is that Hamdi has not received the meaningful judicial review to which the panel acknowledges he is entitled. Such review is possible only if the Executive is required to substantiate its contentions that Hamdi is an enemy combatant with more than a declaration that the panel concedes is hearsay, inconsistent and incomplete. Even in the darkest days of World War II, after the devastating attack on Pearl Harbor, the Supreme Court recognized a greater role for the courts in safeguarding individual liberties than the panel now provides Hamdi. *See, e.g.*, *Quirin*, 317 U.S. at 46. After all, "[i]mplicit in the term 'national defense' is the notion of defending those values and ideals which set the Nation apart." *Robel*, 389 U.S. at 264. I regret that in the name of deference to the political branches' preeminence in matters of war, the panel permits the subversion of the very liberties that make defense of this Country worthwhile.